RENDA *v.* INTERNATIONAL UNION, UAW.

1. MALICIOUS PROSECUTION—LIMITATIONS.
    Actions for malicious prosecution have been hedged about by stringent limitations and courts have allowed recovery only when the requirements limiting it have been fully complied with.

REFERENCES FOR POINTS IN HEADNOTES
[1] 34 Am Jur, Malicious Prosecution § 5.
[2, 3] 34 Am Jur, Malicious Prosecution §§ 167, 168.
[4] 34 Am Jur, Malicious Prosecution § 153.
[5] 53 Am Jur, Trial § 525.
[6] 34 Am Jur, Malicious Prosecution § 168.
[7–10] 34 Am Jur, Malicious Prosecution § 22 *et seq.*
[11] 34 Am Jur, Malicious Prosecution § 166.
[12] 2 Am Jur, Agency § 454.
[13] 35 Am Jur, Master and Servant § 553.
[14] 35 Am Jur, Master and Servant § 560.
[15] 34 Am Jur, Malicious Prosecution § 89.
[16] 3 Am Jur, Appeal and Error § 378 *et seq.*
[17] 34 Am Jur, Malicious Prosecution § 121.
[18] 34 Am Jur, Malicious Prosecution § 93.
[19] 16 Am Jur, Depositions § 19.
[22] 34 Am Jur, Malicious Prosecution § 135.
[23] 16 Am Jur, Depositions § 111.

2. SAME—INSTRUCTIONS—PROBABLE CAUSE—MALICE.
    Malicious prosecution cases require instructions that definitely and clearly define to the jury the legal principles involved in determining whether there ·was an absence of probable cause, whether malice was proven, and whether malice could be inferred from the want of probable cause.

3. SAME—INSTRUCTION—PROBABLE CAUSE—ADEQUATE REQUEST TO CHARGE.
    The denial of an instruction as to what facts, if found to exist, constituted probable cause or a lack of probable cause, although called for in 'a trial of 5 months duration of an action for malicious prosecution in which the facts relating to probable cause were in dispute, was not reversible error, where defendant-appellants failed to present a compilation of such facts in the form of a request to charge.

4. SAME—PROBABLE CAUSE—FACTS KNOWN TO COMPLAINANT.
    Determination in an action of malicious prosecution of whether there had been probable cause for the institution of a criminal prosecution is limited to a consideration of only those facts and circumstances as were known to the complainant at the time of instituting the criminal prosecution and not to facts which have subsequently appeared.

5. TRIAL—REQUEST TO CHARGE PARTLY GOOD AND PARTLY BAD.
    It is proper to refuse a request to charge altogether, where it is partly good and partly bad.

6. MALICIOUS PROSECUTION—REQUEST TO CHARGE—PROBABLE CAUSE.
    Trial court in action for malicious prosecution *held,* correct in refusing to give defendants' proffered request to charge delineating facts which, if found, would have permitted jury to find there was probable cause for having instituted a criminal prosecution of plaintiff and others for assault with intent to kill and murder a named individual, where there were not includable facts therein and no proper request to charge was proffered on such subject.

7. SAME—INFORMER AS PROSECUTOR—DISCRETION OF PROSECUTOR.
    A private person would not be liable in an action for malicious prosecution for having given information to prosecuting authorities which he believes to be true and the officials in the exercise of their uncontrolled discretion initiate criminal prosecution based upon such information even though the information proves to be false and his belief therein was not one which a reasonable man would entertain, as the exercise of the offi-

cial's discretion makes the initiation of the prosecution his own and protects the informer from liability.

8. SAME—INFORMER AS PROSECUTOR.

In an action for malicious prosecution a person is not the initiator of a criminal prosecution who, in good faith, supplies information to law-enforcing officials and does nothing more to advance a subsequent prosecution based upon such information.

9. SAME—INFORMER AS PROSECUTOR—INSTRUCTIONS—EVIDENCE—IMPROPER INDUCEMENT—ESCROW.

The trial court committed reversible error in action for malicious prosecution when he definitely established defendants as the prosecutors of plaintiffs herein on a charge of assault with intent to murder a named individual, where record does not show defendants falsely informed the prosecuting authorities by making any statements to them that were not true, that defendants by improper inducement or pressure on the prosecuting attorney succeeded in securing the warrant for plaintiff's arrest by a person without knowledge of the facts, or that nondisclosure of details of escrow agreement defendants had with a deported hoodlum in Canada who supplied information directly to prosecutor implicating plaintiff in the crime made defendants initiators of the criminal prosecution.

10. SAME—INFORMER AS PROSECUTOR—PROBABLE CAUSE.

One who, in good faith, gives prosecuting officials information which results in the prosecution of another for crime is not liable in an action of malicious prosecution merely because the information given does not meet the test of probable cause.

11. SAME — INSTRUCTIONS — INFORMER AS PROSECUTOR — PROBABLE CAUSE.

Trial court's instruction in action for malicious prosecution that any party who is a proximate cause of a criminal prosecution is himself the prosecutor and may be held liable if the prosecution thereafter ensuing proves to have been commenced without probable cause, *held*, reversible error.

12. PRINCIPAL AND AGENT—INSTRUCTION—AUTHORITY OF AGENT—EVIDENCE—QUESTION FOR TRIER OF FACTS.

Although undisputed or admitted facts as to the existence of the principal-agent relationship and as to the scope of the agent's authority may properly provide basis for trial court's instruction to jury that the principal, as a matter of law, is responsible for the acts of the agent, usually the nature and extent of the authority of an agent and whether the act or contract in

controversy was within the scope of his authority are, under the evidence, questions of fact to be determined by the jury or other trier of facts.

13. MASTER AND SERVANT—PURPOSE OF SERVICE.

The purpose of the service rendered by an employee, and not the method of performance, is the test of whether or not the servant is within the scope of his employment.

14. SAME—LIABILITY FOR SERVANT'S PERSONAL TORT BEYOND SCOPE OF MASTER'S BUSINESS.

The master cannot be held liable for the positive wrong by a servant beyond the scope of the master's business intentionally or recklessly done, as such act constitutes the personal tort of the servant for which the master is not responsible.

15. MALICIOUS PROSECUTION—INSTRUCTIONS—UNIONS—INVESTIGATOR.

Instruction of trial court in action for malicious prosecution against union, its officers and an investigator who worked under the direction of one of its employees in an endeavor to solve the shooting of its president, that, as a matter of law, the union was liable for the acts of the investigator whose conduct in connection with a hoodlum in Canada is alleged to have implicated plaintiff in the shooting, *held*, reversible error, where the evidence is in dispute as to the extent of the investigator's authority and whether or not he was engaged in a positive wrong against plaintiff in order to secure large reward which had been posted by the union.

16. APPEAL AND ERROR—SAVING QUESTION FOR REVIEW—INSTRUCTIONS—REQUEST TO CHARGE—EXCEPTIONS.

Exceptions need not be made to errors in instructions given, or in refusal to give requests, which deprived the jury of instructions essential to arrive at a verdict in accordance with law (CL 1948, § 618.60).

17. MALICIOUS PROSECUTION—MALICE—WANT OF PROBABLE CAUSE.

A jury in an action for malicious prosecution may infer malice on the part of defendants from a want of probable cause in proximately causing the criminal prosecution of the plaintiff, but need not necessarily do so.

18. SAME—INSTRUCTIONS—EXEMPLARY—DAMAGES.

Claim of defendants that it was error in action for malicious prosecution to instruct jury so as to permit it to grant exemplary damages based on want of probable cause without requiring that actual malice be inferred *held*, without merit.

19. DEPOSITIONS—TAKING BEFORE SERVICE OF A DEFENDANT.

A deposition which was noticed and taken before one of several defendants in action for malicious prosecution had been served with process and filed his appearance was not usable in evidence against such defendant and, where trial court had, during the trial, twice so advised the jury, the defendants were entitled to have court give their request to charge that such defendant was not bound by the deposition.

20. MALICIOUS PROSECUTION—PERSONAL KNOWLEDGE OF COMPLAINANT —TERMINATION OF PROSECUTION—EXCLUSIONS FROM JURY.

Claims of error in action for malicious prosecution against union, its officers, employees, investigator, and police officers, (1) that defendant-appellants should be absolved from all responsibility with the criminal prosecution because complaint therein had been signed by police officer as being based upon personal knowledge, rather than upon information and belief, (2) court's denial of motion for directed verdict as to defendant union and 3 of its officers, (3) court's refusal to dismiss action as to all appellants because prosecution of plaintiff had never been legally terminated, and (4) because of exclusion of members of union from jury, *held*, without merit.

21. APPEAL AND ERROR—QUESTIONS REVIEWABLE—EXCESSIVENESS OF VERDICT—MALICIOUS PROSECUTION.

Claim of excessiveness as to $400,000 verdict in action of malicious prosecution is not considered on appeal, where case is reversed for error in instruction and denial of requests to charge.

22. MALICIOUS PROSECUTION—MALICE—EVIDENCE.

A plaintiff in an action for malicious prosecution is given a wide range in producing evidence tending to establish malice and, likewise, defendant is given the same full opportunity to disprove it.

23. SAME—NEW TRIAL—DEPOSITIONS—IMPEACHMENT.

If plaintiff in action for malicious prosecution introduces in retrial of case deposition of hoodlum who had been deported to Canada, defendants should be permitted to introduce the deposition of a member of the Canadian police that the hoodlum had said his original statement to the prosecutor was true and that the deposition testimony was false.

Appeal from Wayne; Kane (Edward T.), J., presiding. Submitted October 3, 1961. (Docket No. 1, Calendar No. 48,535.) Decided March 16, 1962. Rehearing denied May 17, 1962.

Case by Carl Renda against International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, an unincorporated voluntary association, Emil Mazey, Jack Thomas Conway, Samuel T. Henderson, its private investigator, Harold Cranefield, Ralph Winstead, Paul Slack, Claud Ingersoll, Fred Heath, John Lee, Joseph Sheridan, and Bernard Mullins, for conspiracy maliciously to prosecute, for malicious prosecution, and for abuse of process. Directed verdicts and dismissals as to Detroit police officers, defendants Slack, Ingersoll, Heath, Lee, and Mullins. No cause of action as to State police officer, defendant Sheridan. Verdict and judgment for plaintiff against defendants union, Mazey, Conway, Cranefield, and its private investigator, Henderson. Defendants appeal. Reversed and remanded for new trial.

*Joseph W. Louisell* and *Ivan E. Barris,* for plaintiff.

*Walter M. Nelson* (*Simpson, Thacher & Bartlett, Whitney North Seymour, Richard Hawkins, Thomas W. Evans, David H. Fromkin,* and *John A. Fillion,* of counsel), for defendants.

KELLY, J.   Count 1 of plaintiff's declaration (filed June 5, 1954) entitled "conspiracy maliciously to prosecute" named 12 defendants as members of an alleged conspiracy who, with the alleged assistance of other conspirators, namely: Wayne County Prosecuting Attorney Gerald K. O'Brien, Assistant Prosecuting Attorney Joseph P. Rashid, Donald Ritchie, and Attorney Donald Morand, were charged in such count with having unlawfully, wantonly, maliciously, and without probable cause accused plaintiff, in the recorder's court for the city of De-

troit, with the crime of assault with intent to kill and murder Walter Reuther.

Count 2, entitled "malicious prosecution," and count 3, entitled "abuse of process," named the same defendants and co-conspirators.

The defendants named consisted of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (hereinafter referred to as the UAW), and 5 individuals alleged to be its officers, agents, servants, and employees, 5 officers of the Detroit police department, and Michigan State Police Officer Joseph Sheridan.

The trial commenced November 13, 1957, before a jury, and continued approximately 5 months.

March 10, 1958, the court entered an order directing the jury to return a verdict of no cause of action as against 2 of the 5 named Detroit police officers, and the cause as against the other 3 Detroit police officers was dismissed on motion of plaintiff. A suggestion of death of the defendant Winstead was filed on January 8, 1958.

April 17, 1958, the jury returned a verdict of no cause of action against State Police Officer Joseph Sheridan and a $400,000 verdict against the 5 appellants, namely, the UAW; Jack Thomas Conway, its executive assistant to the president; Harold Cranefield, its general counsel; Emil Mazey, its treasurer and secretary; and Samuel J. Henderson, an investigator who worked under the direction of UAW employee Winstead in endeavoring to solve the Walter Reuther shooting.

Appellants' motion for judgment notwithstanding the verdict was denied, and judgment was entered on the verdict on February 3, 1959. Appellants' motion for a new trial was denied by order entered December 9, 1959.

Appellants' appendix (4,121 pages) and brief (108 pages) were filed May 2, 1960, and a 34-page reply

brief was filed August 16, 1961; appellee's appendix (457 pages) and brief (103 pages) were filed February 27, 1961. Oral arguments of counsel for both appellants and appellee were presented to this Court on October 3, 1961.

Walter Reuther, president of the UAW, was shot (April 20, 1948) by an assailant who fired a gun through a kitchen window of his home. In May, 1949, a similar attempt, following the same pattern, was made on the life of Walter Reuther's brother, Victor Reuther.

The UAW offered $200,000 reward for information leading to the solution of the crimes and employed as an investigator Ralph Winstead, a former NLRB investigator. Winstead solicited the assistance of Samuel J. Henderson, a private investigator, with the understanding that Henderson would be compensated by the reward if he solved the crimes, plus expenses incurred in seeking said solution.

An extensive and intensive investigation was continuously conducted by State, county, and Detroit police officials, and UAW investigators. Wayne County Assistant Prosecutor Joseph Rashid was named as co-ordinator of the investigation.

A man by the name of Bolton was charged with the crime and was acquitted in 1950 after a 6-week trial.

Nearly 5 years after the Walter Reuther shooting, Henderson ascertained that Donald Ritchie was confined in the Windsor, Canada, jail. Testimony was introduced that the UAW was interested in Ritchie because of his contacts with underworld characters, plus reports that he had spent large sums of money immediately following the Walter Reuther shooting.

Henderson met with Ritchie (December 11, 1953) shortly after Ritchie's release from jail. During this meeting, which was held at a Windsor, Ontario,

bar, Ritchie indicated that he had information about the Reuther shooting, but would not divulge it unless the reward was modified.

Henderson telephoned Winstead, who was at Detroit. Winstead contacted Prosecuting Attorney O'Brien and they drove to Windsor and conferred with Ritchie. This conference, held in a Prince Edward hotel room, was attended by Betty Ritchie, whom Ritchie introduced as his wife.

At this meeting Ritchie stated that he had been present at the shooting of Walter Reuther, but would not return to Detroit to divulge what he knew unless $25,000 was placed in a Canadian bank, payable to Betty Ritchie. Throughout the conference, which lasted about 1 hour, Ritchie expressed dissatisfaction with the reward as posted because there was no provision for payment in case the underworld silenced or punished him by death, and he also called attention to the risk he was taking in returning because there were Michigan warrants outstanding for his arrest.

Henderson testified that O'Brien told Ritchie, "I have nothing to do with the reward whatsoever." Winstead, in his deposition, stated that O'Brien said: " 'Now, Ritchie, I came over here with the understanding that you have some evidence specifically tending to solve the Walter Reuther shooting, and I didn't come over here to participate in any discussion between you and Winstead on the reward matter.' " Ritchie in his deposition stated: "I told him (O'Brien) I wouldn't go over unless the $25,000 that I had asked for was brought over to the Canadian bank," and O'Brien answered by saying, " 'It couldn't be put in a bank. It would have to be put in escrow.' " We do not have Prosecuting Attorney O'Brien's version, due to his death before trial.

The meeting came to a conclusion with Winstead suggesting that Ritchie select and confer with his

own attorney. Ritchie testified, when asked if a decision was reached in regard to his $25,000 demand:

"They told me they would see what they could do about it and Mr. Winstead give me his phone number and Mr. O'Brien also give me his personal home phone, or one of his phone numbers to get in touch with him at any time."

Three days after this December 11th meeting, Henderson again met with Ritchie and Ritchie decided to consult Windsor attorney Donald Morand, who was Henderson's brother-in-law and Queen's counsel. Morand had some years previous represented a client in a matter involving a single contact with Ritchie.

Various conferences were held between Morand and Conway, Winstead and Cranefield, and, finally, Mazey and Conway decided to meet Ritchie's demands and an escrow agreement satisfactory to Ritchie was prepared by Cranefield.

Twenty-five thousand dollars were deposited on December 22, 1953, with the Crown Trust Company, of Windsor, and the escrow agreement provided that the escrow agent would pay Elizabeth Ritchie (Donald Ritchie's common-law wife) the sum of $4,500 and Donald R. Morand $500 upon satisfactory evidence that Donald Ritchie had given to the prosecuting attorney, at Detroit, a statement and that warrants had been issued for the arrest of a person, or persons, charged with the attempt on the life of Walter or Victor Reuther; that an additional $9,000 should be paid to Elizabeth Ritchie and $1,000 to Morand upon the holding such suspects for trial and similar amounts after conviction of attempt on the life of Walter or Victor Reuther; that in the event Ritchie should die under circumstances indicative of homicide, the last sum of $10,000 should be paid whether conviction is obtained or not.

Between December 17th and December 30, 1953, $300 was paid Ritchie by the UAW to sustain him while his coming to Detroit was under discussion. Two hundred dollars of this amount was paid through Attorney Morand and $100 by Henderson and Winstead.

Ritchie failed to keep an appointment to cross the river to Detroit on December 27, 1953, but he authorized his attorney, Morand, to advise Winstead and Henderson that Ritchie's uncle, Clarence Jacobs, had done the actual shooting and that Ritchie would come to Detroit in early January.

On the night of December 30, 1953, Ritchie unexpectedly took a cab to Detroit and from a night club telephoned Winstead to come and get him. Winstead notified Rashid and Lieutenant Sheridan and then met Ritchie and accompanied him from the night club to the Park Shelton hotel, where Ritchie was taken into custody by Prosecuting Attorney O'Brien, Assistant Prosecuting Attorney Rashid, and Police Officers Slack and Ingersoll.

O'Brien and Rashid questioned Ritchie over a 2-day period and his statements were recorded by a court reporter. Neither Winstead, Henderson, nor any representative of the UAW was present during the taking of these statements.

Ritchie told O'Brien and Rashid that he had accompanied Lombardo and Jacobs to the Reuther home; that Jacobs shot Walter Reuther, and that they were paid for the job by Renda on behalf of Perrone.

As a matter of protection, Ritchie was kept under police guard and moved from hotel to hotel.

Police officers were assigned to check Ritchie's story. An outline of Ritchie's statement was made known to Conway, Winstead, and Henderson, but neither they nor any other representative of the UAW participated in checking Ritchie's statement.

January 5, 1954, Lieutenant Ingersoll, of the Detroit police department, was called to the prosecuting attorney's office and at the request of Prosecuting Attorney O'Brien, signed a complaint which had been previously drawn by Rashid. Ingersoll took the complaint to Judge O'Hara and a warrant was issued against Clarence Jacobs, Santo Perrone, Carl Renda, Pete Lombardo, and 4 John Does.

At approximately 1 a.m., January 6, 1954, plaintiff was arrested at his home and held in custody until he was arraigned and posted bond later the same day.

Shortly after the warrant was issued, Ritchie eluded his police guards and fled to Canada. Before Ritchie's flight was discovered Betty Ritchie collected the $5,000 first instalment from the escrow agent in Canada, and together they left Windsor.

A warrant was issued charging Ritchie with complicity in the Reuther assault on the basis of his confession. Ritchie was apprehended in Canada. He repudiated and retracted his Detroit statement, and fought extradition.

The extradition proceedings were discontinued by the Michigan authorities when their Canadian counsel informed them that Canadian law forbade the extradition of Ritchie without further evidence, his Detroit confession being inadequate under Canadian law, because the reward was offered by private citizens rather than the public authorities.

Without Ritchie the prosecution could not proceed and on the 23d of February, 1954, upon motion of counsel for plaintiff, the presiding judge of recorder's court quashed and dismissed the said complaint and warrant.

At the trial plaintiff introduced and there was read to the jury Ritchie's deposition taken at London, Ontario, on October 18 and 19, 1954. In this deposi-

tion Ritchie testified he had been induced by Henderson to falsely accuse Renda.

Defendants offered in evidence the deposition of Robert Wannell, an inspector with the Ontario provincial police, in which Wannell testified that on June 13, 1956, Ritchie told him that he had driven the car which carried Walter Reuther's assailants to and from the scene of the crime. The court refused to allow the Wannell deposition to be read to the jury.

The deposition of Detective Douglas Lyle Ross of the Sarnia, Canada, police department, was taken January 19 to 23, 1957, and offered by defendants in evidence and excluded at the trial. In this deposition Ross testified that on November 1, 1955, Ritchie told him that his original accusation of Renda was "the real McCoy."

On December 27, 1955, Ritchie gave Ross a signed statement, and in this statement, taken before a justice of the peace in London, Ontario, Ritchie stated that his deposition of October 18 and 19, 1954, was given under duress of threats by Mr. Louisell and that Mr. Louisell thereafter paid him money.*

Thereafter, and before the trial of the present action, plaintiff took a second deposition of Donald Ritchie at Sandwich, Ontario, from December 11, 1956, to January 11, 1957. In this second deposition Ritchie testified that he had not signed the December 27, 1955, statement taken by Detective Ross, and said that he was drunk at the time and did not know what he was saying.

Donald Ritchie was tried for perjury in Canada in November of 1958, for denying in this second deposition that he signed the Ross December 27, 1955, statement and for testifying that he was intoxicated when the statement was taken. A jury found him

---

* Mr. Louisell, mentioned here, was counsel for Mr. Renda from and after the latter's arrest and is record as well as trial counsel for plaintiff Renda in the present suit.

guilty of perjury and convicted him on November 20, 1958, after the trial of the present action had been completed.

The court's instructions extend over 35 pages of the appendix. Six of appellants' "Questions Involved" refer to instructions, as follows: The court erred in (1) Failing to inform the jury what facts, if believed, would constitute probable cause; (2) instructing that any party who is a proximate cause of a prosecution is himself the prosecutor and liable if prosecution ensuing proves to have been commenced without probable cause; (3) instructing that the UAW was liable as a matter of law for actions of defendant Henderson; (4) erroneously coupling instruction that the jury might infer malice from a want of probable cause with charge that it was unnecessary for plaintiff to prove that defendants knew that the information given by Ritchie to the prosecuting authorities was false; (5) allowing the jury to assess exemplary damages without any finding of malice other than the inference from a lack of probable cause; (6) refusing to instruct that the Ritchie deposition was not in evidence against Henderson.

*$25,000 escrow agreement.*

The alleged escrow agreement is repeatedly referred to by appellee as an answer to appellants' claimed errors.

There is no evidence in the record that appellants made false statements to the prosecuting attorney in regard to the escrow agreement, and appellee does not so contend. Appellee's position is simply this: That defendants failed to make known to and concealed from the prosecuting attorney the incidents leading up to and finally culminating in the execution of the escrow agreement, and did so purposely to mislead the prosecuting attorney.

Appellants admit they did not discuss the escrow agreement with the prosecuting attorney because

they were informed that Prosecuting Attorney
O'Brien did not want any discussion on that subject.

Prosecuting Attorney O'Brien's version is not in
the record due to his death before trial. Assistant
Prosecuting Attorney Joseph Rashid, however, was
called by plaintiff and testified that the same night
(December 11, 1953) Prosecuting Attorney O'Brien
talked to Ritchie in Windsor, Canada, O'Brien, upon
his return, told Rashid that Ritchie had mentioned
to him the reward and he had told him that he was
not interested as that was not his problem or pro-
vince and that he told Ritchie to get a lawyer and
"do what you want to do. I am not going to talk
to you about it." Rashid further testified:

"Mr. O'Brien, on that same evening, announced to
me and Mr. Winstead he did not care to discuss the
reward or any portion of it at any time with any per-
son who had information, so I had no knowledge
of any financial arrangement or disarrangement or
rearrangement."

The record does not disclose that O'Brien inter-
rogated Ritchie as to how his demand for modifica-
tion of the reward had been met so as to induce
Ritchie to cross the river to Detroit during the 2-day
interrogation of Ritchie by O'Brien.

A meeting between Morand and the prosecuting
attorney and his assistant was held at O'Brien's
office, in Detroit, the day after the escrow agreement
was entered into. The testimony in regard to this
meeting, which was held preparatory to Ritchie
coming to Detroit, carries no reference to the escrow
agreement or any inquiry on O'Brien's part as to
how Ritchie's December 11th (Prince Edward Hotel,
December 11, 1953) demand for a modification had
been met.

Plaintiff's theory, which the court read to the jury
with the statement that it should result in a verdict

for plaintiff if proven by a preponderance of the evidence, included the following: "That the payments of moneys to Ritchie and the execution of the contract with the deposit of $25,000 of union funds with the Crown Trust Company were hidden and concealed from the prosecuting officials before the issuance of the warrant."

After referring to the $200,000 reward and the $25,000 escrow agreement, the court charged:

"In connection with this matter, you should consider, as to whether or not either the late Gerald K. O'Brien, or Mr. Joseph Rashid were advised of the escrow agreement of $25,000 and of the attendant agreement between Ritchie and the UAW, because no one is guilty of malicious prosecution who fairly states all of the material facts within his knowledge in the matter to the prosecuting attorney, and does so honestly and in good faith. However, no one can avoid the responsibility for putting a malicious prosecution in motion where he intentionally conceals a material fact known to him, touching upon the guilt of the suspect.

"From the testimony in this case, it is for you to decide, did the defendants disclose to the said Mr. O'Brien or to Mr. Joseph Rashid the existence of the escrow agreement and the agreement entered into between the UAW and Donald Ritchie.

"I am leaving it to your determination to say whether or not this was done, and under all the circumstances in the case it is for you to decide, if you find that the facts and circumstances concerning such agreement were not disclosed to the prosecuting attorney, whether or not a business man of ordinary care, prudence and discretion would have revealed the same to the prosecuting authorities."

The court failed, or refused, to comment or give approval or disapproval, to defendants' theory, namely, that "the defendants made a full and complete disclosure to the prosecutor to [of?] all the

facts and circumstances known to them to which the prosecuting officials were willing to listen."

Before passing judgment on claimed instructional errors, attention is called to certain legal principles that should and will be applied.

In *Rogers* v. *Olds,* 117 Mich 368, 371, we stated that the action for malicious prosecution "is strictly guarded" and "is never encouraged except in plain cases." This caution was again repeated in *Roblyer* v. *Hoyt,* 343 Mich 431, 435, when we held:

"Actions for malicious prosecution are regarded by law with jealousy and they ought not to be favored but managed with great caution."

Plaintiff's claim in the present case commences with a declaration stating that 6 defendants who were Detroit and/or State police officers conspired with 5 defendants, namely, the UAW and 4 of its officers and employees, and that collectively these 11 defendant conspirators with aid and assistance of 3 co-conspirators, namely, the Wayne county prosecuting attorney, and his chief assistant, and an underworld character (Ritchie) unlawfully, maliciously and falsely accused plaintiff of participating in the crime of assaulting Walter Reuther.

This unusual claim, set forth at the commencement of this action, was made more unusual by plaintiff's claim, as submitted to the jury in final instructions, that the UAW and its 4 agents should be found guilty of "conspiracy, maliciously to prosecute" because these 5 defendants failed to advise their co-conspirators, O'Brien and Rashid, of the method (the $25,000 escrow agreement) used in bringing the conspiracy to maliciously prosecute to a successful conclusion.

Plaintiff's claim is such that it calls for the test set forth in *Higgins* v. *Knickmeyer-Fleer Realty & Investment Co.,* 335 Mo 1010, 1029 (74 SW2d 805),

where the court stated that actions for malicious prosecution have "been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with."

Malicious prosecution cases require instructions that definitely and clearly define to the jury the legal principles involved in determining whether there was an absence of probable cause, whether malice was proven, and whether malice could be inferred from the want of probable cause.

Taking up appellants' questions involving instructions in detail:

. 1. *Probable cause.*

The court instructed the jury that the plaintiff must prove by a preponderance of the evidence that the defendants did not have probable cause to institute the prosecution and, after stating: "This is, of course, controverted," gave a general definition as to what is meant by "probable cause."

Appellants claim the court erred in submitting the question of probable cause to the jury with such a general instruction without setting forth what facts, if found to exist, would or would not constitute probable cause.

Appellee answers that where facts are undisputable, the court has the right and duty to determine the question of probable cause and, as a matter of law, probable cause is established when an individual does not make a candid and fair disclosure and conceals matters that would have explained unfavorable appearances and exculpate the accused; that the record establishes that the appellants deliberately concealed from the prosecuting attorney the existence of the $25,000 Windsor escrow agreement and, therefore, the court was not "required to render any instruction upon the subject of probable

cause other than to inform the jury that want of probable cause had, as a matter of law, been established. Therefore, the failure of the trial court to instruct the jury as to what facts, if found, constituted probable cause or a lack thereof did not constitute prejudicial or reversible error in view of the fact that the instructions, as given, upon probable cause were more than that to which the appellants were entitled."

Appellee, also, in recognizing the importance of a proper instruction when the facts are in dispute, states:

"While it is true that when the facts are in dispute, it is incumbent upon the trial judge to inform the jury as to what facts, if found to exist, constitute probable cause or lack of probable cause (*Rankin* v. *Crane* [1895], 104 Mich 6; *Slater* v. *Walter* [1907], 148 Mich 650), a corollary of this proposition, also well recognized, is that where the facts are undisputed, the court has the right—in fact—the duty, to determine the question of probable cause. (Citing Michigan authorities.)"

The facts were in dispute in the instant case, and this was recognized by the trial court, who, after instructing the jury that the plaintiff must prove by a preponderance of the evidence that defendants did not have probable cause to institute the prosecution, stated, "This is, of course, controverted."

This trial, which extended over 5 months, and involved the intricate and complex elements necessary to be decided before a jury determination as to whether defendants should be held liable for malicious prosecution, called for an instruction as to what facts, if found to exist, constituted probable cause or a lack of probable cause.

The jury was denied the aid and assistance that such an instruction would have supplied, but we disagree with appellants that such denial constitutes

reversible error and we base our conclusion on the following statement found in *Hall* v. *American Investment Co.*, 241 Mich 349, 354, 355:

"Error is also assigned on the failure of the court to instruct the jury as to what facts in the case if found by them would establish probable cause. What constitutes probable cause in a particular case is a mixed question of law and fact. The correct practice requires that, where the facts are in dispute, the court shall state hypothetically what facts, if found, would constitute probable cause. *Slater* v. *Walter,* 148 Mich 650. That was not done in this case. But the trial judge himself is not required to cull out from the record of the trial and compile for presentation to the jury all the facts, circumstances, and surroundings claimed by defendant to establish probable cause. It is the business of defendant's counsel to do that, and in doing it to keep within the rule limiting the inquiry to facts known when the prosecution was commenced; and to present his compilation to the court in the form of a request to charge.

"Before the case was submitted the court requested counsel to draw up such a statement. He drew up a statement which was not filed or presented as a request to charge, but we will so treat it. It was properly refused. The rule is generally accepted that in determining whether there was probable cause for the institution of a criminal prosecution, only those facts and circumstances as were known to the complainant at the time of instituting the criminal prosecution are to be considered, and not facts which subsequently appeared. The inquiry as to probable cause goes back to the commencement of the criminal prosecution, and it relates to facts then known as they then appeared. 38 C J, Malicious Prosecution, § 37, p 407. The statement drawn up by counsel was objectionable in this, that it included several material facts which did not come to Brighton's knowledge until after the arrest was

made. The rule is well established in this State that where a party asks an instruction which is partly good and partly bad, it is proper to refuse it altogether. *Westchester Fire Ins. Co.* v. *Earle,* 33 Mich 143; *Bedford* v. *Penny,* 58 Mich 424; *Courtemanche* v. *Supreme Court, Independent Order of Foresters,* 136 Mich 30 (64 LRA 668, 112 Am St Rep 345). If the charge was not as full on the subject mentioned as defendant desired, the fault may not be laid at the door of the trial judge."

An examination of the instruction proffered by appellants with respect to probable cause discloses that it commenced with the following statement:

"The facts that were known to the informers, the police and the prosecuting officials at the time of the issuance of the warrant complained of are to be considered by you in determining whether there was probable cause, including the fact that Carl Renda, the plaintiff herein, was the son-in-law of Santo Perrone who was the handler of the scrap at the Michigan Stove Works."

The requested instruction then continues with a lengthy statement in regard to the beatings of the UAW employees at Briggs Manufacturing Company, the contract that Renda had with Briggs to remove scrap, the cancellation of that contract, the fact that Ritchie and Jacobs were in some degree related, and that they also had acquaintance and business with Santo Perrone, at whose gasoline station they frequently appeared.

The proffered instruction then concluded:

"The investigators for the UAW and other defendants by late 1953 had concluded that Clarence Jacobs was the 'trigger man' in the Reuther shootings, and that Donald Ritchie shortly thereafter so stated to his counsel, Mr. Donald Morand, Q.C., who had leave to, and did, so advise defendants, and that Donald Ritchie said that he 'was there' at the Walter

Reuther shooting before the defendants turned Donald Ritchie over to police and the prosecuting attorneys to make a statement, and that the assistant prosecuting attorney, as a witness for plaintiff herein, testified that the prosecuting officials correlated the extremely profitable Renda scrap contract with Briggs with the 6 Briggs beatings and the 2 Reuther shootings in determining whether to issue the warrant complained of by Carl Renda."

The court was justified in refusing defendants' instruction as drawn, and, under *Hall* v. *American Investment Co., supra,* the court did not commit reversible error in failing or refusing to present a proper statement of what facts if found would constitute probable cause.

A recitation by the court to the jury as to what facts constitute probable cause or lack of probable cause, would probably have eliminated many problems presented to this Court in the succeeding claimed errors.

2. *Party initiating prosecution.*

Appellants claim the court erroneously instructed the jury that any party who is a proximate cause of a prosecution is himself the prosecutor, and may be held liable if the prosecution thereafter ensuing proves to have been commenced without probable cause.

Appellants cite the following 5 separate parts of the court's instructions to sustain this claimed error:

"I, therefore, point out to you that for the plaintiff to recover damages, it is not necessary that he prove the defendants knew Ritchie's story was false. As I have elsewhere indicated, it is sufficient for the plaintiff to recover if he has established by a fair preponderance of the evidence that the information relied upon by the defendants in putting the prosecution in motion was not such, nor from such a source that a businessman of ordinary care, prudence, and

discretion would prosecute upon it." (Appendix, p 3578a.)

"The second proposition which the plaintiff must prove by a preponderance of the evidence to establish malicious prosecution is: that the defendants had not probable cause to institute the prosecution here complained of by the plaintiff. This is, of course, controverted, and in order for you to understand what is probable cause, it is, of course, necessary for me to discuss its meaning.

"Probable cause is a state of mind based on information possessed by the defendants and which if believed by them, and is of such and from such sources that the generalities of businessmen or women of ordinary care, prudence, and discretion would, under the same conditions or circumstances, institute prosecution of the plaintiff. This is a criterion which I believe really means that test which would be applied by the ordinary citizen of intelligence, care, prudence, and discretion to, under the same conditions or circumstances, institute prosecution." (Appendix, p 3595a.)

"If you find there was such probable cause you may stop your deliberation and return a verdict for the defendants herein, however, if you find that by a preponderance of the evidence, plaintiff has proven that there was not probable cause, as would move men and women of ordinary care, prudence, and discretion to initiate such prosecution, you will find that the defendants did not have probable cause and you will pass on to the third proposition necessary to be established by a preponderance of the evidence by the plaintiff, and this is as follows: 'that the defendants acted from malicious motives.'" (Appendix, p 3601a.)

"In order for any of the defendants to be held responsible in damages to the plaintiff, it must be shown that the injury here complained of by the plaintiff was the natural and probable consequences of the wrongful act or acts of the defendants, and

that it ought to have been foreseen in the light of attending circumstances. This is known as proximate cause; which is sometimes defined as such a cause as operates to produce particular consequences, which, without the intervention of any independent unforeseen cause the injury would not have occurred." (Appendix, p 3606a.)

"If you find that the natural and probable consequences of the acts of the defendants or any of them was to put prosecution in motion against this plaintiff herein, and you have found that this prosecution was malicious by a preponderance of the evidence in keeping with the instructions I have previously given you, you may consider then that the plaintiff has proven his right to have you consider the question of damages.

"However, if you find that the conduct of the defendants was not the proximate cause of the prosecution, then you would find in favor of the defendants. It is for you to so determine in the light of all the testimony here whether the natural and probable consequences of the acts of the defendants or any of them were such that it brought about the prosecution of the plaintiff herein. The question which you must answer is 'were the acts of the defendants the proximate cause of the prosecution of the plaintiff herein.'" (Appendix, pp 3606a, 3607a.)

Appellants claim the court committed error (1) in assuming it was the defendants, rather than the public authorities, who instituted this prosecution; (2) in stating that if defendants lacked probable cause to institute prosecution of Mr. Renda they might be held liable; and (3) in erroneously charging it was immaterial whether defendants knew that the information given by Ritchie to the prosecutor was false.

Appellee answers by stating that the UAW, through Samuel J. Henderson, an unlicensed detec-

tive, was responsible for "locating" Donald Ritchie; that the UAW entered into a *sub rosa* escrow agreement, one of the provisions of which provided for the payment of $5,000 to Ritchie's nominee upon Ritchie making a statement which would be the basis for the issuance of a warrant; that the appellants abandoned their earlier practice of co-operation with and communication to the prosecuting and law-enforcement authorities and substituted therefor a "sphinxlike silence" concerning the existence of the escrow agreement; that appellants persisted in their "conspiracy of silence" both before and after they were informed on December 31, 1953, by the prosecuting officials that Ritchie had involved appellee in the Walter Reuther shooting; that, although the trial court submitted to the jury as a question of fact whether there had been a disclosure to the law-enforcing officials of the existence of the escrow agreement, the individual appellants admitted during the course of their testimony that there was no disclosure and make no contention to the contrary upon this appeal; that the only reasonable conclusion to be drawn is that but for the "nefarious conduct" of the appellants and of Ralph Winstead, the prosecution against the appellee would not have occurred and that, as a matter of law, they were the initiators of the prosecution; that the trial court explained that in order for plaintiff to sustain his burden of proof upon the issue of want of probable cause, it was not necessary for the appellee to establish that the appellants knew that Ritchie's story was false, but, rather that his onus was merely to show that under all the attendant circumstances the appellants had not acted as reasonably prudent businessmen; that in summation it might fairly be said that the instructions as given by the trial court embodied a correct statement of the applicable law and were, if anything, more beneficial to the appel-

lants than that to which they were entitled, "particularly in view of the fact that upon their own testimony they were, as a matter of law, responsible for the malicious prosecution of the appellee."

According to common law, a person who supplies information to the prosecuting authorities concerning persons possibly implicated in a crime is not himself the prosecutor, unless he knows the information he is supplying to be false, or unless he exerts improper influence upon the prosecuting authorities.

This principle is stated in 3 Restatement, Torts § 653, pp 386, 387, as follows:

"A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving such information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. Where a private person gives to a prosecuting officer information which he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this section even though the information proves to be false and his belief therein was one which a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

"If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible and a prosecution based thereon is procured by the person giving the false information. In order to charge a private

person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated expressed by direction, request, or pressure of any kind was the determining factor in the official's decision to commence the prosecution or that the information furnished by him upon which the official acted was known to be false."

Former Chief Justice COOLEY of this Court commented on the responsibility of instituting a prosecution by stating:

"If one merely furnishes the prosecuting officer with the facts, and the latter, on his own judgment, commences a prosecution, making use of the former as a witness, this is not a prosecution by the witness, and unless he interferes improperly afterwards, he cannot be held responsible as having instituted it."" 1 Cooley on Torts (4th ed), § 121, p 413.

A person is not the initiator of a criminal prosecution who, in good faith, supplies information to law-enforcing officials and does nothing more to advance a subsequent prosecution predicated upon such information. The leading case in this State that establishes this principle is *Christy* v. *Rice,* 162 Mich. 563. In that case, we find that at the close of trial the court was requested to direct a verdict for the defendant on the ground that the advice of the prosecuting attorney afforded complete protection. This was refused and defendant thereupon presented a formal request as follows (pp 565, 566):

" 'It is undisputed in this case that the defendant went to the prosecuting attorney of Kent county and laid the facts before him, and asked the prosecuting attorney for a warrant for perjury against William H. Christy. It is undisputed that the prosecuting attorney refused to issue a warrant without investigating the facts himself; and it is undisputed that the prosecuting attorney did in-

vestigate the facts and determined that there was probable cause to believe that William H. Christy was guilty of perjury, and the prosecuting attorney drew the complaint and had the defendant, Frank E. Rice, sign and swear to the same.

" 'Under the circumstances, I charge you that with the fact that the prosecuting attorney investigated fully the facts and circumstances and acted on his own judgment before the complaint was made and signed by the defendant, Frank E. Rice, was a complete defense, and therefore your verdict will be no cause of action.' "

This request was refused and the case submitted to the jury. Our Court, commenting upon this refusal, stated (pp 566–568):

"The request presented should have been granted. Under the facts as stated in this request, and which are undisputed, the defendant was not responsible for the institution of this prosecution after the declaration by the prosecutor that he would act only upon his own judgment in the matter.   *   *   *

"The prosecutor had declared to him that he would act upon his own judgment and own investigation, and he then assured him that he had satisfied himself by an investigation that there was probable cause for instituting this prosecution. It must be assumed that defendant, in swearing to this affidavit, if he himself believed the truth of the statements, was acting under the direction of the prosecutor, and had the right to assume that the prosecutor was instituting the suit on behalf of the public.   See *Smith* v. *Austin*, 49 Mich 286; *Eno* v. *Allen*, 113 Mich 399.   *   *   *

"The question of what defendant's attitude had been toward accepting the bond was not material to these questions, inasmuch as the prosecutor proposed, on his own authority, and in the outset, to make his own investigation, and so informed the defendant, and defendant relied upon that statement.   *   *   *   But the important consideration is that the

prosecuting attorney assumed to make and did make his own investigation and acted in his official capacity upon that investigation, independent of defendant's statement."

Defendants offered instructions requesting that the jury be informed that they "must be satisfied by a preponderance of the evidence that such defendant or defendants instituted or caused continuance of the prosecution of which plaintiff complains"; that there was offered by "said defendant or defendants advice, encouragement or pressure for the institution of the prosecution"; and "if from the evidence you are in doubt whether 1 or more of the defendants pressured or demanded prosecution or whether he or they left the prosecuting attorney to act entirely on his own judgment and responsibility as to whether a warrant should or should not issue, you must find a verdict of no cause of action for such defendant or defendants as to whom you entertain that doubt."

The court did not give the requested instructions. The excerpts from the above quoted instructions "that the information relied upon by the defendants in putting the prosecution in motion"—"that the defendants had not probable cause to institute the prosecution here complained of"—that if "plaintiff has proven that there was not probable cause, as would move men and women of ordinary care, prudence, and discretion to initiate such prosecution, you will find that the defendants did not have probable cause," establish that the trial judge determined and instructed the jury that the defendants, rather than the public authorities, instituted this prosecution. The court definitely established defendants as the prosecutors.

The only way appellants could properly be designated as "prosecutors" would be by jury deter-

mination that appellants, by false statements, or wilful concealment of facts, or improper inducement or pressure on the prosecuting officials, caused the issuance of the Renda warrant.

Nothing presented justifies a conclusion that appellants falsely informed the prosecuting authorities by making any statements to them that were not true.

There is a total lack of testimony that appellants by improper inducement or pressure on the prosecuting attorney succeeded in securing the Renda warrant. The record establishes that the prosecution came into being when Prosecuting Attorney O'Brien requested Detroit Police Officer Ingersoll to sign a complaint that had been prepared by Chief Assistant Prosecuting Attorney Rashid; that this O'Brien request to Ingersoll had been preceded by 2 days of questioning of Ritchie by O'Brien, followed by O'Brien's and Detroit police officers' check on what appeared to be discrepancies in the Ritchie statement; that neither the defendant UAW, nor any of its officers, employees, or agents, were present during the 2-day court-reported statement that O'Brien obtained from Ritchie.

There is no proof justifying an inference that appellants may have had Officer Ingersoll sign the complaint for them in order to avoid liability. Nor is there any proof from which it might be inferred that appellants knew or expected that Ingersoll would swear to the complaint, on personal knowledge, when he had no such knowledge. Appellants were not, on this record, bound to anticipate that the prosecuting officials might proceed as they did (*Nash v. Mayne,* 340 Mich 502), and the jury should have been instructed accordingly.

The question *in re* appellants' concealment of the $25,000 Windsor escrow agreement that plaintiff claims misled the prosecuting authorities was

majored during trial and, also, in this appeal. This question deserves the Court's most careful consideration and proper instruction presenting to the jury plaintiff's theory, namely appellants "conspiracy of silence", and defendants' theory, that they did not discuss the escrow agreement with the prosecuting authorities because they were informed that the authorities did not want any discussion on that subject.

This instruction the court failed to give. The court presented a useless question—in fact, a question that did not exist, and appellee admits this fact by his statement that:

"Although the trial court submitted to the jury, as a question of fact, whether there had been a disclosure to the law-enforcing officials of the existence of the escrow agreement the individual appellants admitted, during the course of their testimony, that there was no disclosure and make no contention to the contrary upon this appeal."

The court did present the plaintiff's theory as part of the general theory that the court said was sufficient if sustained by a preponderance of the evidence, but the court merely read defendants' claim and either failed or refused to make any comment of approval or disapproval.

After establishing defendants as the prosecutors who instituted the prosecution, the court instructed the jury that they should determine whether the defendants had probable cause "to institute the prosecution here complained of." The prosecution complained of is the prosecution of plaintiff Renda. Appellants in this appeal state that they never claimed they had probable cause to accuse Renda, as Winstead accompanied Ritchie to the Detroit hotel and to Prosecuting Attorney O'Brien on the night of December 31st, and, in this regard, state:

"The effect of this charge was to withdraw from the consideration of the jury the material testimony properly offered and received on behalf of the appellants, and thus to deprive them of their day in court. Such evidence included positive testimony that appellants had no part in the prosecution of plaintiff and were not motivated by any malice against the plaintiff, since they did not even know that he was one of the persons whom Ritchie would implicate; that Richite had told them that he was present at the shooting of Walter Reuther, and that Clarence Jacobs was the man who fired the shot; that Ritchie refused to communicate any further details to the appellants; that the appellants then arranged to have Ritchie furnish his information directly to the prosecuting authorities, without knowing what information he would furnish or whom besides Clarence Jacobs he would accuse; and that appellants, who were not told until after Mr. Renda's arrest the details of the information Ritchie would give or had given to the authorities, were unable to make any check of their own on his accuracy. In these circumstances appellants, not knowing that Mr. Renda was one of those who would be accused, of course did not have probable cause to institute a prosecution against him, and they did not do so."

The court's charge that an informant is subject to malicious prosecution unless the information he gives to the law-enforcing officials meets the test of probable cause, is not a correct statement of law, and to hold that the information must be of such accuracy and strength as to constitute probable cause would frustrate law-enforcing officials in their efforts to combat crime.

We have held that a citizen, without fear of liability, may report information to the public authorities upon mere suspicion, as disclosed by *Birdsall* v. *Smith,* 158 Mich 390, where defendant Smith, who was motivated by spite, secured a sample of milk

from plaintiff's dairy and forwarded it to the public authorities for analysis. Plaintiff was prosecuted and acquitted of the charge of selling adulterated milk. In affirming a directed verdict for the defendants therein, we said (pp 393, 394) :

"If it be admitted that Smith caused samples of milk to be obtained and sent for analysis, he did no more than the law required, if he knew, believed, or suspected it to be impure, whatever his feelings toward plaintiff may have been. There is no testimony tending to prove that he did more than this, and therefore no evidence that he had any part in the prosecution, which appears to have been based solely upon the analysis of the milk which came from the plaintiff's dairy, under the clear proofs in the case."

Appellants herein, claiming the instructions withdrew important issues from the jury's consideration, state:

"The prosecution in this case was commenced upon sworn complaint of a police officer made at the express direction of the prosecuting attorney. The ultimate question, therefore, was whether, even assuming that the institution of the prosecution by the public authorities was malicious and without probable cause, any of the appellants conspired with, or maliciously exerted such improper influence over the public authorities as to be responsible for the prosecution. The important questions of fact in this regard were:

"1. Whether the appellant Henderson had solicited Ritchie falsely to accuse the plaintiff herein of crime; and

"2. Whether, if Henderson did so solicit Ritchie, the other appellants, when they caused Ritchie to furnish information to the public prosecutor, either knew that Henderson had done so or had engaged him, or conspired with him, to do so.

"Under the court's charge these issues were withdrawn from the jury's consideration. * * *

"Instead, the court erroneously charged in substance  *  *  *:

"1. That the introduction by the defendants of Ritchie to the prosecuting authorities for the purpose of having Ritchie furnish a statement to them constituted the institution by the defendants of a prosecution against the plaintiff herein, if such action by the defendants was the proximate cause of the prosecution in the sense that the prosecution was a natural and probable consequence thereof; and

"2. That it was, therefore, unnecessary for the plaintiff to prove that the defendants knew Ritchie's story was false, and that plaintiff might recover if he had established by a fair preponderance of the evidence that the information relied on by defendants with respect to Ritchie was not such that a prudent person would prosecute upon it."

We do not agree with appellee that because appellants were "guilty of deliberate nondisclosure of the existence of the escrow agreement  *  *  *  the only reasonable conclusion to be drawn is that but for the nefarious conduct of the individual appellants and of Ralph Winstead the prosecution against the appellee would not have occurred and that, as a matter of law, they were the initiators of the prosecution."

We agree with appellants that "The court erroneously instructed the jury that any party who is a proximate cause of a prosecution is himself the prosecutor and may be held liable if the prosecution thereafter ensuing proves to have been commenced without probable cause."

3. *Union's liability for acts of defendant Henderson.*

The question naturally arises as this record is studied, and the jurors must have had the thought uppermost in their minds, namely: What caused Ritchie to accuse Renda as the pay-off man in the Walter Reuther shooting, and did he make a false accusation because of the actions of the defendants

and their co-conspirators, the prosecuting attorney and his chief assistant?

No evidence is in the record that any defendant influenced Ritchie to falsely accuse Renda, other than the statement in the deposition of Ritchie that Henderson induced him to falsely accuse Renda.

Defendants contend the court erroneously instructed the jury that the UAW was liable as a matter of law for Henderson's actions, and state that the evidence fails to prove that Henderson was a UAW employee but, even if the jury were to conclude that Henderson was an employee or agent of the UAW, the question still remains as to the scope of his authority to act for the UAW; that if the Ritchie statement was to be believed it disclosed that Henderson and Ritchie conspired together to work against the purpose of the UAW by an effort to convict an innocent person, leaving the guilty free to strike again; that if Henderson corrupted Ritchie he did so against the interests of the UAW.

Appellee contends: "As a matter of law Henderson's acts were the acts of his principal, the UAW"; that Henderson was contacted by Winstead through Michigan State Police Officer Sheridan for the avowed purpose of securing his assistance in investigating the Walter Reuther shooting; that from 1950 until after the issuance of the warrant Henderson spent his full time in investigating the Walter Reuther shooting and during this period his only source of money was reimbursement of expenses by the UAW; that Henderson kept in constant touch with Winstead and Winstead gave instructions, or made requests, to Henderson in connection with the investigation; that Winstead utilized the services of Henderson to locate Ritchie, and Henderson made continuous reports to Winstead as to the contacts with Ritchie; that Henderson took an active part in arranging for Ritchie to contact Morand, and par-

ticipated in the early stages of the negotiations of the terms of the escrow agreement; that Henderson testified that Winstead was his boss.

Appellee again turns to the concealment feature to reach a conclusion that "even if the instruction were erroneous, [it] could not be considered prejudicial or of such a character as to warrant a reversal of the judgment," by stating:

"As has heretofore been discussed, the individual conduct of Conway, Mazey, Cranefield and Winstead in relation to their efforts to conceal from the prosecuting officials the existence of the escrow agreement rendered them, as a matter of law, legally responsible for the malicious prosecution of the appellee."

The instruction follows:

"From the testimony in this matter, it affirmatively appears that the defendants, Jack Thomas Conway, Emil Mazey, Harold A. Cranefield, and Samuel J. Henderson, and the late Ralph D. Winstead, were officers or employees or agents of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, and their conduct is binding on that organization, and it follows that if you find in favor of the plaintiff and against any or all of the defendants I have just named, you will also find against the said organization."

Henderson was a private investigator and not a regular salaried employee of the UAW. He was working on the solution of the Reuther shooting under an arrangement that his expenses would be paid by the UAW. Further compensation depended upon his solution of the crime and, thus, participation in the posted reward.

The deposition of Ritchie to the effect that Henderson had solicited him to falsely accuse Renda was the only direct evidence of improper influence upon

the prosecuting authorities. There was no evidence that other appellants conspired with Henderson to so solicit Ritchie or that they knew that Henderson had so solicited Ritchie.

Appellants correctly refer to the Ritchie deposition and state their position as follows:

"This rule of law is of particular relevance because the only testimony that Henderson induced Ritchie to fabricate accusations (the Ritchie deposition) indicates that Henderson did so for his own account. Henderson, according to Ritchie, hoped to exploit the false testimony by selling the story rights to newspapers, magazines and other media of mass communication, and also hoped to get money from the UAW. Ritchie testified that Henderson said the 2 of them could make a great deal of money together by fabricating testimony. Of course Henderson would have been referring (when speaking of the UAW money) to the possibility of obtaining the $200,000 reward; for Ritchie claimed that Henderson, by way of example, had bragged of obtaining public reward money some years before by successfully submitting a faked 'solution' of a jewel robbery to the authorities. But the money had been appropriated by the UAW in order to apprehend the assailant who sought the lives of the UAW leaders; Henderson thus would have obtained the money without supplying the protection against assassination and the vindication of justice which the money was intended to procure. Conviction of innocent persons would only leave the guilty free to strike again."

Where the facts are either admitted or undisputed as to the existence of the principal agent's relationship and as to the scope of the agent's authority, the lower court may properly instruct the jury that the principal, as a matter of law, is responsible for the acts of the agent. See *Poledna* v. *Bendix Aviation Corporation*, 360 Mich 129; *Timmerman* v. *Henry L. Doherty & Co.*, 246 Mich 19.

The usual and ordinary rule, however, is stated in 3 CJS, Agency, § 330, p 328:

"Usually and ordinarily the nature and extent of the authority of an agent and whether the act or contract in controversy was within the scope of his authority are, under the evidence, questions of fact to be determined by the jury or other trier of facts, and the court may and should decline to take such questions from the jury, or from itself as a trier of facts, by granting a nonsuit, directing a verdict, or otherwise."

In *Loux* v. *Harris,* 226 Mich 315, at page 321, we called attention that:

" 'The purpose of the service rendered by the employee, and not the method of performance, is the test of whether or not the servant is within the scope of his employment. If the purpose is to further the master's business and not that of the servant, the latter is within the scope of his employment though he be negligent or disobeys orders as to the method of its execution.' "

*Emery* v. *Ford,* 234 Mich 11, establishes (p 28):

"In the law of agency it is a fundamental principle that every delegation of power carries with it authority to do all things which are reasonably necessary or *proper* to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden; and as to torts against third parties, even doing a forbidden thing is not always the test, if the agent is acting within the scope of his employment." (Emphasis supplied.)

The rule applicable to a positive wrong by a servant is set forth in *Anderson* v. *Schust Co.,* 262 Mich 236, by our statement (p 240):

"The true rule is that for a positive wrong by a servant beyond the scope of the master's business intentionally or recklessly done, the master cannot

be held liable. Such acts may constitute personal torts of the servant, but the master is not responsible."

The recent case of *Barnes* v. *Mitchell*, 341 Mich 7, deals with a servant's positive wrong, as follows (p 13):

" 'It will be conceded that for a positive wrong beyond the scope of the master's business, intentionally or recklessly done, the master cannot be held responsible; this being very properly regarded as the personal trespass or tort of the servant himself.' "

In this case it was also held (p 20):

" 'In cases where the scope of authority of a servant or agent depends upon disputed matters of fact, the extent of such authority is ordinarily a question for the jury.' "

We agree with appellants that "even if Henderson were an agent of the UAW, and even if Henderson had induced Ritchie to fabricate his accusations, the jury, before imputing Henderson's wrongdoing to the UAW, should still have been required to find that in so doing he acted within the scope of his agency."

We disagree with appellee that "as a matter of law Henderson's acts were the acts of his principal, the UAW," and, also, that because of the concealment feature "an instruction holding the UAW responsible for the acts of Henderson, even if the instruction were erroneous, could not be considered prejudicial or of such a character as to warrant a reversal of the judgment."

The court erred in instructing the jury that the UAW was liable as a matter of law for the actions of defendant Henderson.

This error, added to our decided error (number 2), requires reversal of the judgment and the ordering of a new trial. Consideration will be given to the

additional claimed errors in instructions solely from a new trial standpoint.

In determining that these instructions constituted reversible error, consideration has been given to appellee's request that we keep in mind the fact that errors in the trial court's instructions to the jury were not excepted to.

The statute provides (CL 1948, § 618.60 [Stat Ann § 27.1040]):

"It shall not be necessary to except in any case to the charge of the court to the jury, or to the refusal of the court to charge as requested; but any party considering himself aggrieved by any such * * * charge or refusal to charge, may assign errors the same as if exception had been made according to the practice heretofore in use."

Comments we have made in *Gilson* v. *Bronkhorst,* 353 Mich 148, and in *Rouse* v. *Gross,* 357 Mich 475, do not apply because in the instant case we are not confronted with inadvertent errors as to matters of detail, or isolated errors in context, but errors which deprived the jury of instructions essential to arrive at a verdict in accordance with law.

4. *Inference of malice.*

Appellants contend that the court's charge that the jury might infer malice from want of probable cause was erroneous when coupled with the further charge that it was not necessary for plaintiff to prove that defendants knew Ritchie's story was false and that plaintiff might recover if plaintiff established that the information relied upon by defendants was not such that a businessman of ordinary care would prosecute upon it.

In this regard appellants' position is that honest belief of appellants that Ritchie would give truthful information leading to the discovery of the attempted murderer negates the inference of malice which

would otherwise be proper upon a finding by the jury of want of probable cause.

Appellants' contention is based on the fact that the court "failed to mention that while the jury may infer malice from want of probable cause, it need not necessarily do so."

Appellee answers by saying that "when the undisputed evidence leads but to the conclusion that malice on the part of the defendant was present, the court may properly give a peremptory instruction in favor of the plaintiff upon this issue," and, in the instant case, "the zealousness with which the appellants actively took a part in securing 'proof' upon which to prosecute the appellee"; "the fact that Conway, Mazey and Winstead were of the opinion that the appellee was involved in the beating of UAW members at the Briggs plant"; that all facts create a reasonable inference that the appellants acted with malice in initiating the prosecution and "particularly in the outrageous conduct of all of the appellants in carefully concealing and failing to divulge to the prosecuting officials the existence of the escrow agreement."

Appellee also states that the instruction "did not preclude them (the jury) from considering whether or not the appellants honestly believed his (Ritchie's) story"; that "the jury, under the state of the evidence, might well have concluded, if they tended to disbelieve Ritchie, that the appellants had no actual knowledge of the falsity of his story, but they nonetheless might well have also concluded, and properly so, that the appellants, believing that the appellee had previously been involved in the Briggs beatings and having been frustrated in their effort to have him prosecuted for said beatings, were anxious to embrace the Ritchie story because it suited their purposes notwithstanding they did not honestly

believe it to be true, although they had no actual knowledge of its falsity."

The Briggs plant episode was referred to by the court in reading to the jury defendants' theory that in March, 1945, the Briggs Manufacturing Company abandoned a 15-year practice calling for sealed, periodical bidding for the sale of scrap, and awarded the contract to plaintiff, who, in turn, negotiated with "the identical bidders whose equipment, under sealed bids, had previously, successfully, for years, removed scrap in the Briggs factory," whereby the bidder paid plaintiff "upwards of $2 a ton for the privilege of continuing to remove Briggs scrap"; that as a result of the Briggs-Renda contract, Briggs lost $14,000 a month and plaintiff's annual income increased from "less than $5,000 a year, 1945, to $22,000 in 1946 for Briggs scrap, and $100,000 and $101,000 in succeeding years, or a total of a half a billion [million?] dollars to plaintiff in the 74 months from April 1, 1945 to May 24th, 1951"; that upon the request of the UAW, the Murphy 1-man grand jury, examined "into the alleged relations between Renda's scrap contract with Briggs and the 6 Briggs beatings of UAW local officers"; that plaintiff was required to testify and "the publicity ascribed the demand to Walter Reuther"; that May 24, 1951, plaintiff's contract was canceled by Briggs, acceding to the UAW demand.

The principle applicable is stated in 54 CJS, Malicious Prosecution, § 43, p 1008:

"Want of probable cause does not in itself, however, prove that malice motivated the prosecution, or raise a conclusive or legal presumption of malice. * * * In other words, the inference is not one of law but merely a presumption of fact which may be rebutted and is one which the jury are not required to draw, and which they should not draw if other

facts disclosed by the evidence lead to a different conclusion."

There is merit to both appellants' contention and appellee's answer. The question raised can be avoided in a subsequent trial by an instruction that includes the statement that, while the jury may infer malice from want of probable cause it need not necessarily do so.

5. *Exemplary damages.*

Appellants contend:

"The charge of the trial court in the instant case, allowing the jury to assess exemplary damages without any finding of malice other than the jury might infer from their finding of lack of probable cause, was erroneous. Prejudicial effect of the error clearly appears from the return of a verdict for $400,000 in a case where only some $18,500 in pecuniary damage was shown."

Appellants claim the court erred by giving an instruction which permitted exemplary damages based on want of probable cause without requiring that actual malice must be inferred.

Appellee, disagreeing with appellants, states that:

"Since malice is an essential element of malicious prosecution, the trial court, having instructed the jury that a finding of malice was essential to any recovery by the appellee, correctly informed the jury that they might award exemplary damages, as properly defined by him, as well as compensatory damages, to the appellee, in the event that they found for the appellee upon the issue of liability.

\* \* \*

"Exemplary damages may, if the jury sees fit to do so, be awarded in *every* malicious prosecution suit in which the jury determines that the defendant is liable for the reason that the basis for the awarding of exemplary damages, namely actual

malice, is an element of the cause of action for malicious prosecution."

We see no merit to appellants' contention.

6. *Deposition in evidence.*

Appellants contend the court erred in refusing to instruct the jury that the Ritchie deposition was not in evidence as against Henderson, and appellee answers by stating:

"On 2 occasions during the course of the trial, the trial court in clear and unequivocal language informed the jurors that they could not consider the deposition of Donald Ritchie as being evidence against, *inter alia,* Samuel J. Henderson."

The Ritchie deposition could not be considered against Henderson, because the deposition was noticed and taken before appellant Henderson had been served with process and before he had filed his appearance herein. During the trial the court so instructed the jury.

The appellants later prepared an instruction requesting that as a part of the court's final instruction, the jury be charged that Henderson was not bound by Ritchie's deposition, taken at London, Ontario, on October 18 and 19, 1954. The court failed to comply with this request.

Appellants were entitled to this instruction.

Appellants' "Questions Involved" also list the following claimed errors: (1) Failure to absolve defendants of all responsibility with the prosecution because Police Officer Ingersoll swore to the complaint which purported to state the facts upon personal knowledge and not upon information and belief; (2) the court's denial of the motion to direct a verdict and enter a judgment notwithstanding the verdict in favor of the UAW, Mazey, Conway and Cranefield; (3) the court's refusal to dismiss the action as to all appellants for the reason that the

prosecution of Renda had never been legally terminated; (4) the exclusion of AFL-CIO members from the jury.

These 4 claimed errors are disposed of by our finding that they are without merit and we see no good reason for extending this lengthy opinion by commenting further in regard to same.

In view of our decision to reverse and remand, we do not pass judgment on appellants' claim that the verdict was excessive.

Appellants complain because they were denied the right to introduce in evidence the depositions of Ross and Wannell (Canadian police officers). In disposing of this issue, we shall consider whether defendants shall be allowed to introduce in evidence the Ross deposition if plaintiff introduces the Ritchie deposition in a subsequent trial.

We agree with appellants' statement that "Ritchie's testimony was of capital importance to the plaintiff, and its impeachment, to the defendants."

Ritchie is plaintiff's witness. Ritchie's first deposition was taken by plaintiff at London, Ontario, on October 18 and 19, 1954, 10 months subsequent to Ritchie's statement to Prosecutor O'Brien that Renda was the pay-off man in the Reuther shooting. Ritchie's statement in this deposition that Henderson solicited him to accuse Renda was the only testimony that any defendant influenced Ritchie to name Renda.

Detective Douglas Ross, of the Canadian police, in his deposition, testified that 11 months after the Ritchie October, 1954, deposition, Ritchie told him that he (Ritchie) told the truth when he gave his statement to Prosecutor O'Brien; that he lied when he testified at his deposition hearing.

A proper foundation for the impeachment of Ritchie was laid by defense counsel in plaintiff's

second Ritchie deposition, taken by plaintiff December 11, 1956, through January 11, 1957, at Sandwich, Ontario.

In malicious prosecution not only is plaintiff given a wide range tending to establish malice; but, likewise, the defendant is given the same full opportunity to disprove it.*

Appellee calls to our attention that the record discloses that "Ritchie was a hoodlum with a long police record"; "was once deported from the United States"; and that "a warrant for the arrest of Ritchie was outstanding in Macomb county."

We cannot judge what credence a jury would give to Ritchie's testimony if plaintiff again offers his testimony at a subsequent trial. If plaintiff offers Ritchie's deposition, he could only do so with the thought, or hope, that the jury would give credence to same. It would be an injustice to deny defendants the right to introduce the Ross deposition.

We, therefore, find that if plaintiff introduces the Ritchie deposition, defendants shall have the right to introduce the Ross deposition.

Reversed and remanded for new trial.

Dethmers, C. J., and Carr, Black, and Souris, JJ., concurred.

Kavanagh, J., did not sit.

Otis M. Smith and Adams, JJ., took no part in the decision of this case.

---

* *Richter* v. *Neilson*, 11 Cal App 2d 503 (54 P2d 54); 54 CJS, Malicious Prosecution, § 90, p 1070; 2 Wigmore, Evidence, § 258 (a) and (c), pp 78–80; 4 Callaghan Michigan Pleading & Practice, Evidence, § 36.238; *Hickey* v. *Shellenbarger*, 180 Mich 548; *LeClear* v. *Perkins*, 103 Mich 131 (26 LRA 627).