**Millard BASS, Plaintiff,**

**v.**

**Werner SPITZ, Individually and as Wayne County Medical Examiner, and the County of Wayne, Defendants.**

**Civ. A. No. 78–71712.**

United States District Court,
E. D. Michigan, S. D.

Sept. 18, 1981.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Robert K. Tanenbaum, Jack Gruenstein, Philadelphia, Pa., Gerald I. Krafsur, Southfield, Mich., for plaintiff.

James G. Gross, John J. McCann, Asst. Wayne County Corp. Counsel, Detroit, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

Dr. Millard Bass brought this suit against his former employer, Wayne County, Michigan, and the person who appointed him, Dr. Werner Spitz, Wayne County Medical Examiner.[1] In 1976, plaintiff was "indefinitely suspended" from his position as an assistant medical examiner for Wayne County, and prosecuted on criminal charges of mutilating dead bodies. The charges were dismissed at the preliminary examination. These facts are set forth more fully in my earlier Opinion. *Bass v. Spitz*, 510 F.Supp. 182 (E.D.Mich.1981).

Plaintiff presented both a federal and a state law claim to the jury. He contended that his "indefinite suspension" without hearing in the midst of adverse publicity deprived him of his liberty without due process of law (federal claim); he also contended that Wayne County, through Spitz and others, maliciously prosecuted him on charges of mutilation of dead bodies, a violation of Mich.Comp.Laws § 750.160 (Mich. Stat.Ann. § 28.357 (Callaghan 1962)). The jury awarded plaintiff damages of $600,000 for malicious prosecution, but found for Wayne County on the liberty interest claim.[2] The statute requires the trebling of the jury verdict.

Both parties have brought post-trial motions.

## I. Defendant's motion for judgment notwithstanding the verdict

Judgment on the verdict was entered April 3, 1981. On April 10, defendant filed a motion for a new trial. On May 13, it filed a motion for permission to supplement the new trial motion. Permission was erroneously granted. The supplement, filed May 28, included a motion for judgment notwithstanding the verdict.

■ Federal Rule of Civil Procedure 50(b) states:

Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict.

Federal Rule of Civil Procedure 6(b) states, "[T]he court . . . may not extend the time for taking any action under Rule[s] 50(b)." Defendant's motion for a new trial and its motion for judgment notwithstanding the verdict must each have been brought within the prescribed period in order to be timely. The filing of one motion does not relieve defendant of its distinct obligation to file the other motion on time. *See Johnson v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 48, 50–51, 73 S.Ct. 125,

---

**1.** During trial, Spitz was dropped as a defendant.

**2.** Plaintiff's three other claims were disposed of through dismissal or summary judgment before the case went to the jury.

126–27, 97 L.Ed. 77 (1952). Thus, this motion must be denied.[3]

## II. *Defendant's motion to alter the judgment*

In the May 28 supplement to its new trial motion, defendant argues that I erroneously trebled the jury verdict in the judgment. Mich.Comp.Laws § 600.2907 (Mich.Stat. Ann. § 27A.2907 (Callaghan 1980)) states:

Every person who shall, for vexation and trouble or maliciously, cause or procure any other to be arrested, attached, or in any way proceeded against, by any process or civil or criminal action . . . shall be liable to the person so arrested, attached or proceeded against, in treble the amount of the damages and expenses which, by any verdict, shall be found to have been sustained and incurred by him.

The Michigan Court of Appeals has held that damages should not be trebled if the court has instructed the jury to include punitive damages in its verdict. *LaLone v. Rashid*, 34 Mich.App. 193, 203, 191 N.W.2d 98, 103 (1971). By analogy, defendant argues that damages should not be trebled if the court has instructed the jury to include damages for mental distress in its verdict. The Michigan Court of Appeals explicitly rejected this interpretation of the statute in *Rivers v. Ex-Cell-O Corp.*, 100 Mich.App. 824, 838–40, 300 N.W.2d 420, 426–27 (1980), but defendant maintains that I am not bound by its decision.

I do not need to decide whether I have authority to disagree with the Michigan Court of Appeals on this issue, or the substantive issue itself.[4] Defendant has presented this argument as part of its motion for a new trial. Nonetheless, it must be construed as a motion to alter the judgment, brought under Federal Rule of Civil Procedure 59(e). *Dove v. Codesco*, 569 F.2d 807, 809 (4th Cir. 1978); *Seshachalam v. Creighton University School of Medicine*, 545 F.2d 1147 (8th Cir. 1976) (per curiam), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977); *Maryland Tuna Corp. v. MS Benares*, 429 F.2d 307, 317–18 (2d Cir. 1970). *See Smith v. Hudson*, 600 F.2d 60, 62–63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). As such, it had to be served within ten days after entry of judgment. Federal Rule of Civil Procedure 6(b), 59(e). The pleading in which this motion is contained was not served on plaintiff until May 27, 1981, more than a month after judgment was entered. Thus, it must be denied.[5]

## III. *Defendant's motion for a new trial*

Defendant moves for a new trial on three grounds. First, it contends that the jury's finding of liability was contrary to the great weight of the evidence. Second, it contends that my instructions to the jury were erroneous. Third, it contends that the jury's verdict on damages was excessive.

### A. *Weight of the evidence on liability*

Defendant argues that the jury's finding of malicious prosecution is contrary to the

---

**3.** Defendant's motion for judgment notwithstanding the verdict raises the same issues as its motion for a new trial. Section III (A) *infra*. Because of my disposition of these issues in the context of the new trial motion, the motion for judgment notwithstanding the verdict would still be denied on its merits, if it had been filed on time.

**4.** Plaintiff also argues that defendant waived this objection by failing to object to my instruction on mental distress damages knowing that plaintiff planned to have the verdict trebled. Federal Rule of Civil Procedure 51. I do not need to reach this issue. Defendant has also filed a motion to certify this issue of trebling to the Michigan Supreme Court. Because the is-

sue is not properly before me, there is nothing to certify.

**5.** Even if I reached the merits of this motion, I am not convinced that this matter falls within my limited authority to disagree with the Michigan Court of Appeals on an issue of state law. *See Stoner v. New York Life Insurance Co.*, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (1940); *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Six Companies of California v. Joint Highway District No. 13*, 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114 (1940); *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940).

great weight of the evidence [6] because there is little evidence that Dr. Spitz initiated the prosecution of either complaint against plaintiff, or that he did so without probable cause.[7] I find enough evidence in the record on these two issues to reject defendant's argument.

Two criminal complaints were filed against plaintiff. In the first complaint, he was charged with decapitation of the body of a woman named Glenda Reed. On this charge, the strongest evidence against him was a group of three cervical vertebrae found in his desk at the Wayne County Medical Examiner's office. Spitz fit these three vertebrae with a fourth vertebra taken from the body. Patrick Foley, the assistant prosecutor who investigated the charges against plaintiff, testified that Spitz "told us they fit like a puzzle, and I believe his statement was that they came from the same body." (Tr. 2/23/81, at 2123). He admitted that he relied on Spitz as a medical expert, and saw no reason to consult other doctors. (Tr. 2/23/81, at 2123 and 2130).

Later, at plaintiff's preliminary examination, the degree of certainty in Spitz's identification began to erode. On direct examination, he stated, "My opinion is that they [the vertebrae] match so perfectly that I am bound to believe that they do come from

the same person." (Tr. 2/9/81, at 926; 2/25/81, at 22). On cross-examination, however, he stated, "(I)t is my professional opinion that they could very well come from the same person.... Nobody can say that [in fact, they come from the same body]. There is no way this can be established." (Tr. 2/25/81, at 23–24). He explained that his opinion was derived only from fitting the vertebrae together, because there was no other method to determine if they came from the same body. (Tr. 2/25/81, at 26–28). At trial, it became clear that other identification techniques exist. (Tr. 2/24/81, at 2234–35, 2245–54).

■■ A person "initiates" a prosecution if he makes false statements to prosecuting officials or wilfully conceals facts from them, causing them to recommend issuance of a warrant. *Renda v. U.A.W.*, 366 Mich. 58, 86-87, 114 N.W.2d 343, 357 (1962). From this evidence, the jury properly could have concluded that Spitz intentionally overstated his ability to identify the vertebrae from plaintiff's desk as part of the body of Glenda Reed.[8] Foley admitted that he relied on Spitz's medical expertise. Thus, the jury properly could have found that Spitz "initiated" the prosecution.

Similarly, the jury properly could have concluded that Spitz acted without probable cause to believe plaintiff committed a

---

**6.** Both parties apparently agree that federal law measures the amount of evidence necessary for a jury verdict to withstand a motion for a new trial. The Supreme Court has twice declined to decide whether state or federal law supplies this standard in diversity cases. *Mercer v. Theriot*, 377 U.S. 152, 156, 84 S.Ct. 1157, 1160, 12 L.Ed.2d 206 (1964) (per curiam); *Dick v. New York Life Insurance Co.*, 359 U.S. 437, 444–45, 79 S.Ct. 921, 925–26, 3 L.Ed.2d 935 (1959). At least when the motion is for judgment notwithstanding the verdict, the United States Court of Appeals for the Sixth Circuit has held that state law governs. *Gold v. National Savings Bank*, 641 F.2d 430, 434 (6th Cir. 1981). Its rule on the law governing a new trial motion is less clear. *See Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.), *cert. denied*, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967). *See generally Trivette v. New York Life Insurance Co.*, 283 F.2d 441, 443–47 (6th Cir. 1960) (Pope,

J., dissenting), *cert. denied*, 368 U.S. 838, 82 S.Ct. 33, 7 L.Ed.2d 38 (1961). Because the federal and state standards appear to be identical, I do not need to decide this question. *Compare Duncan v. Duncan, supra*, at 52 *with Termaat v. Bohn Aluminum & Brass Co.*, 362 Mich. 598, 602, 107 N.W.2d 783, 785 (1961).

**7.** Defendant also argues that the verdict is contrary to the great weight of the evidence if its liability was derived from the actions of John Barr, Chairman of the Wayne County Board of Commissioners at the time plaintiff was prosecuted. Because I find ample evidence to support the verdict in the alleged actions of Dr. Spitz, I do not reach this issue.

**8.** I do not mean to suggest that I necessarily would have reached the same conclusion. Most facts were bitterly contested at trial, and many different theories were developed to explain portions of the evidence.

crime.[9] When Spitz exhumed the body of Glenda Reed, he found that its condition did not match the description in her autopsy report. The report indicated that plaintiff had autopsied the body, and that the head was attached to the body at the time of the autopsy. Spitz found that the head was missing, and that no autopsy had been performed. The jury properly could have concluded that these discrepancies gave Spitz probable cause to believe that something unusual had occurred, but that there were too many other potential explanations for him to have probable cause to believe that plaintiff committed a crime.[10] *Clanan v. Nushzno, supra* note 9, 261 Mich. at 427–28, 246 N.W. 168.

Because the jury properly could have found defendant liable for malicious prosecution of this complaint, I do not need to consider its argument that a verdict based on the other complaint would be contrary to the great weight of the evidence. This ground for a new trial must be rejected.

**9.** As long ago as 1878, the Michigan Supreme Court described this requirement in detail. It said:

[T]he information possessed [must be] believed and [be] such and from such sources that the generality of business men of ordinary "care, prudence and discretion" would prosecute upon it under the same conditions. *Hamilton v. Smith*, 39 Mich. 222, 226 (1878). Of course, the only information which should be considered is the information which the defendant knew when he initiated the prosecution. *E.g., Renda v. U.A.W., supra*, 366 Mich. at 77, 114 N.W.2d at 352.

For some reason, Michigan courts have often stated that a person acts without probable cause if he fails to make a full and fair disclosure to the prosecuting attorney. *E.g., Gooch v. Wachowiak*, 352 Mich. 347, 351, 89 N.W.2d 496, 498 (1958); *Clanan v. Nushzno*, 261 Mich. 423, 429, 246 N.W. 168 (1933); *Thomas v. Bush*, 200 Mich. 224, 227–28, 166 N.W. 894 (1918). The meaning of this statement is unclear. *See Wilson v. Yono*, 65 Mich.App. 441, 444, 237 N.W.2d 494, 496 (1975) ("Although the cases seem to talk in terms of probable cause, it is clear that the rule is based upon the idea that defendant has not in fact instituted the prosecution.").

**10.** This apparently was the opinion of Recorder's Court Judge Dalton Roberson when he dismissed this complaint against plaintiff for

**B.** *Instructions on scope of defendant's liability*

Defendant next contends that a new trial is necessary because I erroneously instructed the jury on the scope of defendant's liability for malicious prosecution. Defendant maintains that it was error for me to instruct the jury that defendant was liable if Spitz maliciously prosecuted plaintiff "either alone or in combination with others", (Tr. 3/3/81, at 119–20), and to refuse to give its proposed instruction on the status of the prosecutor's office.[11] It alleges that this permitted the jury to find it liable for the joint actions of Spitz and Assistant Prosecutor Foley, or other members of the prosecutor's staff. Defendant has submitted copious briefs on the independence of the Wayne County Prosecutor's office from the municipal corporation of Wayne County. It pressed this issue several times during trial, and at the hearing on post-trial motions.

■■ I did not find then that defendant's point was relevant, and I do not find

lack of probable cause at the preliminary examination. (Tr. 2/19/81, at 46).

Plaintiff suggested that Spitz may have fabricated this evidence. (Tr. 3/3/81, at 28 and 49). Because the jury properly could have concluded that these discrepancies did not give Spitz probable cause to believe plaintiff committed a crime, I do not need to consider whether there was sufficient evidence for the jury to conclude that Spitz fabricated them. (Tr. 2/9/81, at 906–10). *See generally* note 8 *supra*.

Defendant now contends that I should have decided whether Spitz had probable cause, rather than submit the issue to the jury. Under Michigan law, this issue is for the jury only if the facts which may give rise to probable cause are disputed. *Clanan v. Nushzno, supra* note 9, 261 Mich. at 427, 246 N.W. 168. Defendant apparently assumes that this allocation of duties between judge and jury in Michigan state courts is binding on a federal court in a diversity suit. Whether or not this is true, defendant waived this objection by failing to raise it before I instructed the jury. Federal Rule of Civil Procedure 51. (Tr. 3/3/81, at 4 and 9–10).

**11.** Defendant has waived the first objection. Federal Rule of Civil Procedure 51.

so now. Defendant was found liable for malicious prosecution under the doctrine of respondeat superior. *See Renda v. U.A.W.*, 366 Mich. at 91–97, 114 N.W.2d at 359–62. It was found liable for the actions of its employee, Dr. Spitz, "either alone, or in combination with others." Under Michigan law, there is joint and several liability among joint tortfeasors. *Meier v. Holt*, 347 Mich. 430, 435–36, 80 N.W.2d 207, 210–11 (1956). Thus, if the jury found that Spitz conspired with Foley or other prosecutors, their status would not reduce or eliminate defendant's liability. The instruction I gave was correct. The instruction defendant proposed would only have confused the matter.[12]

### C. Excessiveness of jury's award of damages

Defendant's final contention is that a new trial is necessary because the jury's award of damages is excessive.[13] I agree. The jury awarded plaintiff $600,000. The record simply does not support such a large verdict.

Plaintiff testified that he incurred $68,000 in legal fees and $5,000 in travel costs because of his prosecution. (Tr. 1/28/81, at 117 and 119–20; 1/30/81, at 318–22). The jury properly could have believed this testimony. The only other elements of damages which plaintiff tried to prove were lost income and mental distress.[14] These items could not reasonably account for the remainder of the award.

Plaintiff testified that the publicity surrounding his prosecution destroyed his career as a forensic pathologist. (Tr. 1/28/81, at 120–27; 1/30/81, at 305–08). He explained that he continued to work in other medical positions, but did not describe his economic loss in detail. (Tr. 1/29/81, at 206). He claimed that he earned about $33,000 as an assistant medical examiner, but only earned $26,000 to $28,000 after he cleared himself of the criminal charges. (Tr. 2/5/81, at 622–26). Dr. Marvin Aronson, Chief Medical Examiner for the city of Philadelphia, testified that the starting salary of an assistant medical examiner is now between $40,000 and $42,000 per year, and that it rises to $47,000 to $50,000 per year after about five years. (Tr. 2/12/81, at 71).

The only other quantitative testimony on lost income was that of Dr. Paul Taubman, plaintiff's economic expert. Taubman testified that plaintiff sustained $264,400 in economic damages between 1976 and 1980, and that he would sustain an additional $945,500 in damages between 1981 and 1997. (Tr. 2/17/81, at 1649). He described some of the assumptions which he made in his calculations, (Tr. 2/17/81, at 1649–89), but plaintiff introduced no evidence to support many of these assumptions.

---

**12.** Defendant also maintains that the jury may have included punitive damages in its award. I instructed the jury that it could include in its verdict on malicious prosecution "other items of damage." (Tr. 3/3/81, at 124). Later, I instructed the jury that it could award punitive damages on plaintiff's § 1983 liberty interest claim. (Tr. 3/3/81, at 133–34). Defendant argues that the jury may have interpreted "other items of damage" to include punitive damages. Reading the instructions in their entirety, I doubt that this could have occurred. In any event, defendant waived this objection. Federal Rule of Civil Procedure 51.

**13.** It is not clear whether the standard for a new trial based on an excessive jury award is one of state or federal law. *See Gold v. National Savings Bank, supra* note 6, at 434 n.3; *Jones v. Wittenberg University*, 534 F.2d 1203, 1212 (6th Cir. 1976); *Manning v. Altec, Inc.*, 488 F.2d 127, 132–33 (6th Cir. 1973), *overruled*

*on other grounds, Donovan v. Penn Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). Because neither party contends that the Michigan standard is different from the federal standard, I do not consider this question. *Cf.* Michigan General Court Rule 527.1(4) [new trial may be granted if verdict is clearly or grossly excessive].

**14.** Plaintiff also offered evidence about the interest on a loan which he obtained to pay his legal fees, and about a house which he sold. The former is not distinct from his legal fees, because any monetary damage includes the loss of the later use of that money. Plaintiff could have introduced evidence of appropriate interest, but did not do so. *Banish v. City of Hamtramck*, 9 Mich.App. 381, 398–400, 157 N.W.2d 445, 453–54 (1968). Evidence about the sale of the house was not admitted. (Tr. 1/28/81, at 118; 1/29/81, at 155–60).

■ Defendant's major contention is that plaintiff presented no evidence that he will continue to suffer lost income in the future, despite his recovery in this lawsuit. It is clear that Taubman was not competent to testify to the likelihood of future economic loss. He simply extrapolated future earnings from plaintiff's 1980 income. (Tr. 2/17/81, at 1672). Plaintiff urges that Dr. Aronson testified on this point. He cites the following passage from the record:

> Q: May we have your opinion as to whether or not any of the publicity affected—would affect Dr. Bass' being hired as a forensic pathologist?
>
> A: I have an opinion, and that opinion, it would very much affect the hiring of Dr. Bass. He would be a so-called hot potato to be hired, having been in trouble, and the arrest might impair his effectiveness as a witness in court.

(Tr. 2/12/81, at 66).

Both the context of this testimony and the reason Aronson gave for his opinion lead me to reject plaintiff's interpretation of this passage. Just before this question was asked, the following exchange occurred:

> Q: Did you ever become aware of the publicities surrounding Dr. Bass's removal and arrest?
>
> A: Yes, sir.
>
> Q: And has that ever been discussed among the forensic pathologists at seminars and/or meetings?
>
> A: Yes, it has.
>
> Q: Now, has that fact been discussed with respect to the employability, the fact of hiring Dr. Bass as a forensic pathologist?
>
> A: Yes.

* * * * *

> Q: And what, if anything, has been discussed with respect to whether or not, to your recollection, Dr. Bass would be hired as a result of the bad publicity he would receive because of the firing and the attendant arrest?
>
> Defense Counsel:
>
> I object, your Honor, to the attempt to elicit hearsay and further object to counsel testifying in this matter.

(Tr. 2/12/81, at 64–65). Plaintiff then agreed to rephrase his question. These earlier questions make it clear that Dr. Aronson was asked for his opinion about plaintiff's employability in light of the criminal prosecution. He was not asked whether plaintiff was likely to remain a "hot potato", despite a substantial verdict in an action for malicious prosecution.

Furthermore, the reason Aronson gave suggests that plaintiff is unlikely to have trouble finding a job in the future. Aronson explained that plaintiff's credibility could be questioned if he was called to testify in court about the cause and manner of someone's death. To the extent that such questions could relate to the criminal prosecution,[15] it seems likely that information about plaintiff's substantial recovery in this lawsuit would destroy the impeachment value of information about the prosecution.

■ Thus, I find *no* evidence from which the jury could conclude that plaintiff will continue to have trouble getting a job as a forensic pathologist.[16]

Defendant also contends that there was no evidentiary basis for Taubman's testimony that plaintiff sustained $264,400 in past economic damage.[17] Taubman conducted a private investigation of these damages. (Tr. 2/17/81, at 1648, 1649 and 1659). Plaintiff concedes that Taubman's testimony on many items was not corroborated by

---

**15.** No court in Michigan would admit such evidence. Fed.R.Evid. 608, 609; Michigan R.Evid. 608, 609.

**16.** Plaintiff seeks to introduce evidence of an incident which occurred after trial as support for the jury's award. Defendant moves to strike the portion of plaintiff's brief which discusses the incident. Obviously, the incident is

irrelevant. It did not occur until after the jury returned its verdict. Nothing would be gained, however, by purging the parties' briefs of irrelevant material.

**17.** Defendant also argues that plaintiff never established that expert testimony would aid the jury. I do not reach this issue.

any other evidence in the record. He argues that this investigation testimony is sufficient to justify much of the jury's award. Defendant argues that it should not have been admitted.[18]

Taubman testified to the following items of damage from his personal investigation:

1. He testified that "a Mr. Eckett ... indicated to me that it was quite common for people in the forensic medicine field to earn from 10 to 20 per cent as outside earnings." (Tr. 2/17/81, at 1651).

2. He testified that "some document ... indicated [plaintiff] had been negotiating with the National Institute of Health to receive research grants.... [Plaintiff] indicated to me that he was planning to work on Saturdays and two nights a week.... He could have had 20 per cent of his salary." (Tr. 2/17/81, at 1652).

3. He testified that plaintiff "was negotiating with the Wayne State Medical School to teach a course there.... So his actual opportunity there to receive earnings were well in excess of 20 per cent." (Tr. 2/17/81, at 1652).

4. He testified that plaintiff "was actively soliciting—actively available for outside consulting." (Tr. 2/17/81, at 1652).

5. He testified that plaintiff "has been working approximately 30 per cent more hours [in his current job] than he was in the Wayne County Medical Examiner's Office." (Tr. 2/17/81, at 1652–53).

6. He testified that "I obtained the data on the fringe payments he actually received.... I compared them with the fringes he could have received if he were still employed as a medical—assistant medical examiner. I checked with both Oakland County and Wayne County, and they both indicated that the general fringe benefit package was somewhere between 33 and 35 per cent of salary." (Tr. 2/17/81, at 1653).

7. He testified that "Wayne County ... has not returned to [plaintiff] the $3800 of the accumulated capital [from his retirement account]." (Tr. 2/17/81, at 1659).

8. He testified that "In order to continue to make himself eligible for forensic medicine, he has spent money on travel and preparation of exhibits which he exhibited at Harvard and the Smithsonian Institute. For 1977, that was $700.00; for 1978–79 and '80, that was $2700.00." (Tr. 2/17/81, at 1670).

Plaintiff urges that this testimony is admissible because "the facts or data ... upon which an expert bases an opinion ... need not be admissible in evidence." Fed.R.Evid. 703.

Plaintiff's argument misses the point. Taubman is an economist. He had no special expertise to testify that plaintiff suffered particular types of damage. He had no expertise to testify that these damages were proximately caused by the criminal prosecution. Thus, he could not testify in these areas beyond the limits of his personal knowledge. Fed.R.Evid. 701. Anything else was hearsay. Fed.R.Evid. 801(c).[19]

Experts routinely offer opinions based in part upon factual assumptions not derived from their expertise. Evidence usually has been presented to support these

---

18. Defendant objected to Taubman's testimony several times. (Tr. 2/17/81, at 1649, 1654, 1655, and 1659). The issue was discussed on the record, (Tr. 2/17/81, at 1655–68), and I admitted it, subject to connection. (Tr. 2/17/81, at 1667–68).

19. The distinction is drawn very clearly in *Twin City Plaza, Inc. v. Central Surety and Insurance Corp.*, 409 F.2d 1195 (8th Cir. 1969). The court noted, "[A] court may exclude evidence where an expert is asked for the speed of a vehicle based upon skid marks, when foundational evidence showing that the skid marks belong to the car in question is totally lacking." 409 F.2d at 1200. Taubman's expertise in skid marks does not render admissible his hearsay testimony that defendant was driving.

assumptions before the expert testifies. If not, the court may still admit the testimony, "subject to connection." Fed.R.Evid. 611(a). If the connecting evidence is never offered, however, the opinion is irrelevant.[20] Fed.R.Evid. 401. *See Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 633 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978) ("[W]e recognize the trial judge's discretion to confine the testimony of the expert within the limits of the facts shown."). Most of Taubman's testimony was never connected.

The only competent evidence on lost income was the testimony of plaintiff. He stated that his income in 1975, before the criminal prosecution, was $33,000. (Tr. 2/5/81, at 623). In 1976, he earned only $15,845. (Tr. 1/29/81, at 206; 2/5/81, at 623). In 1977, he earned $12,630. (Tr. 1/29/81, at 206; 2/5/81, at 624). In 1978, he earned between $20,000 and $30,000. (Tr. 1/29/81, at 206; 2/5/81, at 625). In 1979, he earned $28,000. (Tr. 1/29/81, at 206; 2/5/81, at 626). From this testimony, the jury properly could have concluded that plaintiff lost about $65,000 in income.

The final element of damages presented to the jury was mental distress. There was extensive evidence of mental distress, (Tr. 1/29/81, at 175–79 and 193–94; 1/30/81, at 308–10; 2/5/81, at 611–12 and 614; 2/11/81, at 1117–21 and 1168–70; 2/17/81, at 1580–1603 and 1620–22; 2/20/81, at 1964–65), and the jury properly could have awarded plaintiff a substantial amount of damages. Damages of this kind are always subjective, and it is impossible to specify reasons for a particular sum. To rule upon this motion, however, I am forced to set some figure which the jury properly could have awarded plaintiff. I set this amount at $50,000.

I conclude from this review of the evidence that the jury's award is excessive.[21] For the reasons stated, I find that the jury properly could have awarded plaintiff $188,000.[22] Therefore, unless plaintiff agrees on or before November 1, 1981 to a remittitur of $412,000 of the jury's verdict, I will grant defendant's motion for a new trial, limited only to the issue of damages. This finding means that the amount of $188,000 is trebled and that plaintiff would be entitled to receive $564,000 in damages, together with costs and interest.

IV. *Plaintiff's motion for interest on judgment*

Plaintiff moves for interest on the judgment. Defendant contends that plaintiff is entitled to interest only on the amount of actual damages.

28 U.S.C. § 1961 provides: "Interest shall be allowed on any money judgment ... from the date of the entry of the judgment, at the rate allowed by State law." In a diversity suit, however, prejudgment interest is allowed if it is permitted under state law.[23] *Massachusetts Benefit*

---

20. Ideally, defendant should have raised this issue before I instructed the jury. Nonetheless, his failure to do so does not prevent me from considering it now. My authority to order a new trial *sua sponte* would have little practical meaning if I could only do so when timely objections had been made throughout the course of the trial. Federal Rule of Civil Procedure 59(d).

21. Defendant argues that the award is excessive because the jury was influenced by passion or prejudice. I do not need to consider this issue.

22. There is a split of authority on whether state or federal law determines the amount to which a jury verdict should be reduced by remittitur. *Compare Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1046–47 (5th Cir. 1970),

*cert. denied*, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972), *with Meissner v. Papas*, 35 F.Supp. 676, 677 (E.D.Wis.1940), *modified on other grounds*, 124 F.2d 720 (7th Cir. 1941). Similarly, when the matter is governed by federal law, there is a split of authority on the appropriate standard. *See* 6A Moore's Federal Practice ¶ 59.05[3], at 59–54 to 59–58 (2d ed. 1973). Neither party has briefed either issue, and I do not find discussion of them necessary on the facts of this case.

23. Presumably, state law is followed because prejudgment interest supposedly affects the "outcome." *See Hanna v. Plumer*, 380 U.S. 460, 466–69, 85 S.Ct. 1136, 1141–42, 14 L.Ed.2d 8 (1965). The reason for this holding is not clear. In either state or federal court, a plaintiff is entitled to full compensation for the ele-

*Association v. Miles,* 137 U.S. 689, 691, 11 S.Ct. 234, 235, 34 L.Ed. 834 (1891); *Clissold v. St. Louis-San Francisco Railway Co.,* 600 F.2d 35, 39 n.3 (6th Cir. 1979). Mich.Comp. Laws § 600.6013(2) (Mich.Stat.Ann. § 27A.6013(2) (Callaghan Supp.1981)), states:

> For complaints filed before June 1, 1980, . . . the interest on the judgment shall be calculated from the date of filing the complaint to June 1, 1980 at the rate of 6% per year and on and after June 1, 1980 to the date of satisfaction of the judgment at the rate of 12% per year ·compounded annually.

Thus, plaintiff's position is that the word "judgment" refers to the full trebled amount of the verdict. Defendant's position is that it refers only to the amount of the verdict before it was trebled.

No Michigan statute defines "judgment." *See generally* Mich.Comp.Laws § 600.112 (Mich.Stat.Ann. § 27A.112 (Callaghan 1976)); 2 J. Honigman & C. Hawkins, Michigan Court Rules Annotated 627–28 (2d ed. 1963). The Michigan Court of Appeals has used the term in malicious prosecution cases to refer to the trebled verdict. *E.g., LaLone v. Rashid, supra,* 34 Mich.App. at 204, 191 N.W.2d at 103. Indeed, in one case the Court of Appeals has held without discussion that interest should run on the trebled amount. *Markowicz v. Pappas,* 102 Mich. App. 1, 9, 300 N.W.2d 713, 717 (1980) (per curiam). The alternative interpretation which defendant urges apparently has never been considered.

In 1965, the Michigan legislature amended Mich.Comp.Laws § 600.6013 to provide interest on a judgment from the date the complaint was filed, instead of the date of the judgment. The statute was amended to

insure that plaintiffs receive compensation for the delay in payment of damages between these two dates. *Schwartz v. Piper Aircraft Corp.,* 90 Mich.App. 324, 326, 282 N.W.2d 306, 308 (1979); *Waldrop v. Rodery,* 34 Mich.App. 1, 4, 190 N.W.2d 691, 693 (1971). Ironically, the statute no longer appears necessary in order to provide a plaintiff with full compensation. In *Banish v. City of Hamtramck, supra* note 14, 9 Mich.App. at 398–400, 157 N.W.2d at 453–54, the Court of Appeals held that interest may be recovered as an element of damages whenever it is necessary in order to provide adequate compensation. In *Bruno v. Detroit Institute of Technology, supra* note 23, 51 Mich.App. at 600 n.1, 215 N.W.2d at 749 n.1, it held that awards for future damages must be reduced to their value on the date interest begins to run. Together, these decisions insure that a plaintiff's recovery is not affected by the date upon which damages are measured. *See* note 23 *supra.* Thus, if evidence is presented on the appropriate adjustments, neither party is benefited nor jeopardized by delay in the payment of damages.

The only situation in which *Banish* and *Bruno* do not protect a plaintiff fully from the cost of delay is when a plaintiff seeks treble damages or exemplary damages. If the statute was interpreted to provide interest from the date of the complaint on actual damages only, the real value of a recovery of treble damages or exemplary damages would dwindle as the time between the filing date and the date of judgment increased. In this case, plaintiff would be compensated with interest only at the rate of 2% from 1978 until June 1, 1980, and 4% from that date on. The statute was amended precisely to prevent erosion in the

---

ments of damage which he sustained, as those elements are defined by state law. Damages must be measured on a particular date. Damages sustained before that date should be increased, and damages sustained or expected after that date should be decreased, to reflect their value on that date. Interest should run on this adjusted amount, from the date selected. If this is done, the selection of a particular date, e. g., the date the complaint is filed or the date of the judgment, does not affect the value of

plaintiff's ultimate recovery. Thus, under proper instructions, the matter seems procedural. *Compare Banish v. City of Hamtramck, supra* note 14, at 398–400, 157 N.W.2d at 453–54, *and Bruno v. Detroit Institute of Technology,* 51 Mich.App. 593, 600 n.1, 215 N.W.2d 745, 749 n.1 (1974), *with Carey v. Piphus,* 435 U.S. 247, 254–59, 98 S.Ct. 1042, 1047–50, 55 L.Ed.2d 252 (1978), *and Chesapeake & Ohio Railway Co. v. Kelly,* 241 U.S. 485, 489–91, 36 S.Ct. 630, 631–32, 60 L.Ed. 1117 (1916).

value of a judgment, and to discourage a defendant from delaying litigation. These purposes are best served by allowing interest on the full trebled amount of plaintiff's recovery.

In *Schwartz v. Piper Aircraft Corp., supra*, 90 Mich.App. at 327, 282 N.W.2d at 309, the Michigan Court of Appeals held that interest under Mich.Comp.Laws § 600.6013 should not be compounded. The statute was amended last year to provide interest "from the date of filing the complaint to June 1, 1980 at the rate of 6% per year and on and after June 1, 1980 to the date of satisfaction of the judgment at the rate of 12% per year compounded annually." As amended, the statute could be read either to provide compounded interest from the date the complaint was filed, or only from June 1, 1980. The 1980 amendment was intended to insure full compensation by providing an adequate rate of interest. I believe that compounded interest from the date of the complaint is more consistent with this goal.

In summary, plaintiff may recover interest on the judgment at the rate of 6% per annum from the date of filing of the complaint to June 1, 1980 and thereafter until the judgment is paid at the rate of 12% per annum, compounded annually.

## V. *Plaintiff's Proposed Bill of Costs*

Pursuant to Federal Rule of Civil Procedure 54(d), plaintiff presented to the Clerk of the Court a proposed bill of costs which totaled $53,213.36.[24] Because many of the items in the proposed bill were extraordinary expenses not covered by 28 U.S.C. §§ 1920–1924, I directed plaintiff to submit a brief on the taxability of each of the enumerated expenses as an item of costs. I decided to rule on the proposed bill myself rather than review the Clerk's preliminary determination.

Plaintiff contends that many of his litigation expenses may be taxed as costs as part of an award of his attorneys' fees.[25] He presents three theories to justify an award of attorney's fees. I reject each argument.

First, plaintiff contends that he is entitled to attorney's fees under 42 U.S.C. § 1988. Section 1988 has been interpreted to permit the recovery of attorney's fees in certain situations in which a plaintiff has brought both "fee" (claims for which § 1988 permits recovery of attorney's fees) and "non-fee" claims together, and has prevailed on the "non-fee" claim. *E. g., White v. Beal*, 447 F.Supp. 788, 793–94 (E.D.Pa. 1978); *Southeast Legal Defense Group v. Adams*, 436 F.Supp. 891, 894–95 (D.Or. 1977). Plaintiff argues that these cases support recovery of fees here.

In H.R.Rep.No.94–1558, 94th Cong., 2d Sess. 4 n.7 (1976), the House Judiciary Committee stated:

To the extent a plaintiff joins a claim under one of the statutes enumerated in H.R.15460 with a claim that does not allow attorney fees, that plaintiff, if it prevails on the non-fee claim, is entitled to a determination on the other claim for the purpose of awarding counsel fees. [Citation omitted]. In some instances, however, the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the nonconstitutional claim is dispositive. [Citation omitted]. In such cases, if the claim for which fees may be awarded meets the "substantiality" test [i. e., not so attenuated and unsubstantial as to be absolutely devoid of merit] [citations omitted], attorney's fees may be allowed even though the court declines to enter judgment for

---

**24.** Plaintiff's affidavits reflect expenditures of $53,574.17. The discrepancy has not been explained.

**25.** Because of my disposition of the issue of attorney's fees, I do not need to consider whether, under any of plaintiff's attorney fees theories, certain out-of-pocket expenses should be recoverable in a separate award, or be deemed to be included in the basic fee award.

*See, e.g., Northcross v. Board of Education*, 611 F.2d 624, 639 (1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) (certain out-of-pocket expenses recoverable as supplement to attorney's fee award under 42 U.S.C. § 1988. For unknown reasons, plaintiff's attorneys have submitted no affidavits on the number of hours they have spent on plaintiff's case.

the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a "common nucleus of operative fact." [Citation omitted].

Although it was the Senate bill, S.2278, which was enacted as § 1988, this footnote from the legislative history of H.R.15460 has often guided courts in the hybrid cases it describes.[26] *E. g., Seals v. Quarterly County Court,* 562 F.2d 390, 393–94 (6th Cir. 1977); *White v. Beal, supra,* at 793–94.

 In light of this footnote, plaintiff's argument under § 1988 must be rejected. Plaintiff brought both "fee" (§ 1983 liberty interest claim) and "non-fee" (malicious prosecution) claims, but he lost his "fee" claim on the merits. The only reasonable interpretation of the first sentence quoted above is that such a result precludes recovery of his fees.

Plaintiff cites *Seals v. Quarterly County Court, supra,* as support for a broader interpretation of § 1988. In *Seals,* black voters challenged a system of at-large voting for members of the county legislative body, under 42 U.S.C. § 1983. The District Court dismissed the claim. The United States Court of Appeals for the Sixth Circuit vacated the decision, and remanded the case for further consideration in light of intervening Supreme Court decisions. The District Court again denied the claim. On the second appeal, the Court of Appeals expressly reserved review of the constitutional claim, and remanded again to permit the plaintiffs to amend their complaint to add a state law claim. The District Court then found for the plaintiffs on the state law claim, but denied attorney's fees because the plaintiffs had lost their "fee" claim on the merits. On the third appeal, the Court of Appeals reversed the District Court's denial of attorney's fees. The Court found that the plaintiffs were entitled to recover their fees because they had prevailed on their state law claim. The Court quoted the footnote from the legislative history of

H.R.15460, except for the first sentence. The defendants apparently emphasized the first sentence in their arguments. The Court responded:

We note, but do not agree with the arguments of Defendants on this issue. We have read the sentence preceding the material quoted above from the House Report footnote. It deals with an entirely different situation. In our instant case, fees could clearly have been awarded if Plaintiffs had prevailed on their *federal constitutional* claim. And, of course, ... they can be awarded under present facts (i. e., the District's [sic] Court's granting of relief on the alternative state claim basis).

562 F.2d at 394.

This decision is difficult to understand. At the time the District Court rejected the plaintiffs' "fee" claim, there was no "non-fee" claim. The District Court Judge had not decided a significant constitutional issue only for the purpose of awarding attorney's fees. He had decided the issue because, at the time, it was necessary to do so in order to decide the case. It is not clear why the policy against unnecessary constitutional adjudication, *see, e. g., Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), requires that a finding on a "fee" claim be disregarded for the purpose of § 1988 if it appears *later* that the case can be resolved on nonconstitutional grounds.

If I were forced to reconcile *Seals* with the language of the footnote, I would interpret the footnote to apply to the problem of unnecessary constitutional decisionmaking whether it first surfaces in the District Court or in the Court of Appeals. In *Seals,* the plaintiffs received full relief under state law. Thus, the Court of Appeals would have had to review the District Court's finding on the plaintiffs' constitutional claim only in order to decide whether attorney's fees could be recovered. The Court of

---

**26.** The published legislative history of S.2278 does not mention hybrid "fee" and "non-fee" cases. *See* S.Rep.No.94–1011, 94th Cong., 2d Sess. 1, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5908. On the other hand, the only

difference between the two bills is that the House version would not have provided for recovery of fees in federal tax collection cases. *See* H.R.Rep.No.94–1558, at 5.

Appeals was faced with the situation described in the footnote, even though the District Court had not been. *Cf. Harrington v. Vandalia-Butler Board of Education,* 585 F.2d 192, 198 (6th Cir. 1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) ("The plaintiffs [in *Seals*] could apparently have prevailed under their federal claim and received relief thereunder.").

I conclude, however, that this case differs significantly from the situation described in the footnote and in *Seals.* They deal with cases in which the federal and state law claims provide alternative bases for relief. Here, plaintiff's "fee" and "non-fee" claims both had to be submitted to the jury because the claims involved different sets of facts and different elements of damages. Plaintiff's liberty interest claim required proof that Spitz and others made public statements which made it difficult for plaintiff to get another job. In addition, plaintiff had to prove that he was under duress when he resigned from his position. *Bass v. Spitz, supra,* at 186–87. Although plaintiff's claim of malicious prosecution arose at the same time, it required proof of an entirely different set of facts. Moreover, plaintiff sought punitive damages only under the liberty interest claim. Thus, both claims had to be decided on their merits. Because plaintiff lost his "fee" claim, § 1988 does not authorize recovery of his fees.

▆▆ Plaintiff raises two other arguments in support of an award of attorney's fees. He urges that he is entitled to fees under Mich.Comp.Laws § 600.2907 (Mich. Stat.Ann. § 27A.2907 (Callaghan 1980)), and that the finding of liability for malicious prosecution establishes "bad faith", one of the equitable exceptions to the general federal rule against the award of fees. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). I disagree. If plaintiff had brought his federal and state claims in separate actions, I conclude that he would not have been able to recover his attorneys' fees in either suit. I do not believe that consolidation of his claims into a single action should change this result.[27]

### A. Recovery of fees in § 1983 suit

▆▆ Only successful litigants may recover attorney's fees under the "bad faith" exception to the general federal rule against the award of fees. *Alyeska Pipeline Service Co. v. Wilderness Society, supra,* at 258–59, 95 S.Ct. at 1622. *F. D. Rich Co. v. United States,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). Plaintiff lost his § 1983 claim on its merits. Thus, if he had brought this claim in a separate suit, he would not have been able to recover his attorney's fees.

### B. Recovery of fees in malicious prosecution suit

Mich.Comp.Laws § 600.2907 (Mich.Stat. Ann. § 27A.2907 (Callaghan 1980)) provides recovery for malicious prosecution of "treble the ... amount of damages and expenses which, by any verdict, shall be found to have been sustained and incurred by him." Plaintiff contends that the attorney's fees which he incurred to bring his malicious prosecution claim should be included in the "expenses ... incurred."

▆▆ Plaintiff cites no authority for his interpretation of Mich.Comp.Laws § 600.2907, and I reject it as implausible.

27. In a diversity case, a federal court applies state law on the recovery of attorney's fees. *Alyeska Pipeline Service Co. v. Wilderness Society, supra,* at 259 n.31, 95 S.Ct. at 1622 n.31. In a federal question case, on the other hand, the issue of attorney's fees is governed by federal common law doctrines. *Id.,* at 257–60, 95 S.Ct. at 1621–23. Jurisdiction in this case was based both upon the existence of a federal question (§ 1983 liberty interest claim) and upon diversity of citizenship (malicious prosecution claim). I have found no case which analyzes the issue of attorney's fees when both of these types of jurisdiction are present. *See Kalmbach, Inc. v. Insurance Company of State of Pennsylvania,* 422 F.Supp. 44, 45 (D. Alaska 1976); *Mintz v. Allen,* 254 F.Supp. 1012 (S.D.N.Y.1966). Although in other circumstances the problem may require extensive analysis, *see Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the proper result seems clear when the plaintiff could not recover his attorney's fees under either claim individually.

Michigan has long held that attorney's fees are not a proper element of damages. *E. g., Hatch v. Hart*, 2 Mich. 289 (1851). In other contexts, the state legislature has used clearer language to create exceptions to this general rule. *E. g.*, Mich.Comp.Laws § 722.717(b) (Mich.Stat.Ann. § 25.497(b) (Callaghan 1974)). *See Houfek v. Shafer*, 7 Mich.App. 161, 170–72, 151 N.W.2d 385, 390 (1967). The statute includes recovery of expenses found *by the verdict* to have been incurred. Especially in light of the problems which may arise when an attorney acts both as lawyer and as witness, *see* Michigan DR 5–101(B), I do not believe that the legislature envisioned the unusual procedure which plaintiff apparently advocates. I conclude that the only attorney's fees covered by the phrase are those which plaintiff incurred in defense of the criminal prosecution. Thus, if plaintiff had recovered on his malicious prosecution claim in a separate state suit, he would not have been entitled to an award of attorney's fees.[28]

### C. Other Costs

■ Without an award of attorney's fees, many of the expenses described in plaintiff's affidavits simply may not be taxed to defendant. 28 U.S.C. § 1920 sets the basic limits of taxable costs. Attorneys' airfare and hotel accommodations, and many of plaintiff's other itemized expenses, cannot be taxed under any sensible reading of this statute. Of what remains, I tax the following expenses to defendant as costs.

■ First, I award the expenses routinely taxed as costs. This includes plaintiff's $15.00 filing fee and the marshal's fee of $3.00 for service of process, 28 U.S.C. § 1920(1), and $505.00 paid in witness attendance fees, 28 U.S.C. § 1920(3).[29]

■ Second, I award as costs the expenses which plaintiff incurred to take the depositions of major witnesses:

| | |
|---|---|
| M. Bass and W. Spitz | $847.75 |
| W. Cahalan | 66.92 |
| P. Foley | 346.50 |
| W. Spitz | 679.40 |
| Total | $1,940.57 |

These witnesses testified extensively at trial, and preparation for trial would have been inadequate without their depositions.[30] 28 U.S.C. § 1920(2). *See Chemical Bank v. Kimmel*, 68 F.R.D. 679, 683–85 (D.Del.1975); *Dorothy K. Winston & Co. v. Town Heights Development, Inc.*, 68 F.R.D. 431, 434 (D.D. C.1975); *Electronic Speciality Co. v. International Controls Corp.*, 47 F.R.D. 158, 162 (S.D.N.Y.1969).

■ Third, I award as costs the expense of the daily trial transcript, and the transcript of the jury charge. This was a complex case, and both parties benefited from a ready reference to earlier testimony. Defendant's new trial motion draws heavily on the transcripts both of the testimony and of the jury charge. 28 U.S.C. § 1920(2). *See Electronic Specialty Co. v. International Controls Corp., supra*, at 160–61. According to plaintiff's affidavit, the total cost of these transcripts was $9,187.00.

■ Fourth, I award the cost of copies of X-rays of Glenda Reed. Both parties used these X-rays extensively at trial, and

---

**28.** Plaintiff could also argue that, in a separate suit for malicious prosecution, he would be entitled to attorney's fees under a state law counterpart of the "bad faith" exception described in *Alyeska Pipeline Service Co. v. Wilderness Society, supra*. I find no Michigan statute or court rule which would authorize recovery of attorney's fees on this basis. Even if a general statute or court rule permitted recovery of attorney's fees for this type of "bad faith," it could well be argued that Mich.Comp. Laws § 600.2907, as interpreted in *LaLone v. Rashid, supra*, provides the exclusive remedy for the act of malicious prosecution. Even if I had clear discretion to award fees for "bad faith," I would decline to do so because it would be senseless to "punish" Wayne County taxpayers for conduct for which they are liable only because of the doctrine of respondeat superior.

**29.** Plaintiff claims an additional $107.50 in witness attendance fees, but no documentation of these expenses has been provided and, thus, they are not allowed.

**30.** The other people whom plaintiff deposed either did not testify at trial, or testified only in limited areas. Plaintiff has made no showing that their depositions were necessary. In fact, I do not even recognize some of the deponents' names.

the case would have been incomplete without them. I find taxation of their cost reasonable. 28 U.S.C. § 1920(4). *See Esler v. Safeway Stores, Inc.*, 77 F.R.D. 479, 483 (W.D.Mo.1978); *Mikel v. Kerr*, 64 F.R.D. 93, 95–96 (E.D.Okla.1973), *aff'd*, 499 F.2d 1178, 1182–83 (10th Cir. 1974). Copies of these X-rays cost $32.25.

 Fifth, I award plaintiff's expenses for duplication of documents, $217.25.[31] This case required many documentary exhibits, including transcripts of earlier court proceedings. Plaintiff provided me with copies of most of his proposed exhibits before trial. These copies made the disposition of evidentiary issues more efficient. I find taxation of this expense to be reasonable. 28 U.S.C. § 1920(4). *See Banks v. Seaboard Coast Line Railroad Co.*, 62 F.R.D. 21, 22 (N.D.Ga.1974).

 Finally, I award plaintiff's expenses for a private process server. Although such expenses are not explicitly covered by 28 U.S.C. § 1920(1), I have limited discretion to award as costs necessary expenses similar to those described in the statute. *See Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 231–32, 85 S.Ct. 411, 414–15, 13 L.Ed.2d 248 (1964); Federal Rule of Civil Procedure 54(d). Federal Rule of Civil Procedure 4(c) was amended last year to permit service of process by any person authorized to serve process in an action in the state courts of the state in which the federal court sits. Plaintiff presumably relied upon this rule when he selected a private process server. Although 28 U.S.C. § 1920(1) has not been amended to reflect the change in Rule 4(c), the Judicial Conference has recommended such legislation. Meanwhile, to encourage litigants to employ private process servers, I find it reasonable to tax their fees as costs. For the same reason, I find it reasonable to tax as costs the fees of the process server for

serving subpoenas. *See* Federal Rule of Civil Procedure 45(c). Although plaintiff's documentation of these expenses is very poor,[32] I find adequate evidence of the following charges:

| | |
|---|---|
| P. Foley – 11/7/80 | $ 25.00 |
| 24 individuals – 12/9/80 and 12/10/80 | 426.00 |
| S. Warren – 12/16/80 | 17.50 |
| J. McCann – 1/5/81 | 15.00 |
| Total | $483.50 |

Thus, I award plaintiff costs of $12,383.57.

Two other proposed costs merit comment. Travel and subsistence allowances for witnesses are ordinarily taxed as costs. *See* 28 U.S.C. § 1821. Plaintiff's affidavits provide no information on these amounts. I refuse to speculate on the matter.

Second, plaintiff seeks to tax as costs the expenses he incurred for five experts. Four testified at trial.[33] Their bills reflect consulting fees and expenses. Defendant concedes that I have authority to include these expert witness fees in an award of costs.

The authority to award such fees as costs is not clear. In *Henkel v. Chicago, St. Paul, Minneapolis and Omaha Railway Co.*, 284 U.S. 444, 446, 52 S.Ct. 223, 224, 76 L.Ed. 386 (1932), the Supreme Court held that expert witness fees greater than the fees set forth in the Act of April 26, 1926, c. 183, 44 Stat. 323 (current version at 28 U.S.C. § 1821), could not be taxed as costs under the common law predecessors of 28 U.S.C. § 1920. Later, in *Farmer v. Arabian American Oil Co., supra*, at 232, 85 S.Ct. at 415, the Court held that Federal Rule of Civil Procedure 54(d) provides independent authority for a court to award as costs expenses not listed in 28 U.S.C. § 1920. In *Farmer*, however, the defendant sought to tax the expense he incurred to transport witnesses from another country to the United States. At the

---

**31.** Plaintiff claims an additional $3,832.79 in expenses for duplication of documents, but has presented no documentation and, thus, they are not allowed.

**32.** Several of the receipts appear to relate to a different case. Of those which clearly involve

witnesses from this case, many do not specify whether the fee was for service of process, or for other services.

**33.** I have no idea who the fifth person is.

time *Farmer* was decided, such expenses were covered in full by 28 U.S.C. § 1821. Thus, the Court did not consider whether Rule 54(d) gives a district court discretion to tax as costs the types of expenses listed in 28 U.S.C. § 1821 in excess of the amounts provided there.

 I do not reach this question because I would decline to tax these expenses as costs, even if my authority to do so was clear.[34] Other courts have not taxed them routinely. *See Esler v. Safeway Stores, Inc., supra,* at 481–82; *Sperry Rand Corp. v. A–T–O, Inc.,* 58 F.R.D. 132, 137 (E.D.Va. 1973). Plaintiff did not seek court approval before he hired these experts. Other experts from local universities may have been able to provide the same assistance for substantially less money. *See Farmer v. Arabian American Oil Co., supra,* at 234–35, 85 S.Ct. at 415–16; *Pizarro-de-Ramirez v. Grecomar Shipping Agency,* 82 F.R.D. 327, 330 (D.P.R.1976).

## VI. *Conclusion*

Thus, unless plaintiff files a remittitur on or before November 1, 1981, as ordered, defendant may have a new trial, limited only to the issue of damages. This means that plaintiff may recover the trebled amount of $564,000. Plaintiff may additionally recover interest on this amount at the rate of 6% per annum from the date of the filing of the complaint to June 1, 1980 and thereafter until the judgment is paid at the rate of 12% per annum, compounded annually.

Costs are allowed in the amount of $12,-383.57.

An appropriate order may be submitted.

---

**34.** The parties also agree that I have discretion to follow Michigan law regarding the taxation of expert witness fees. The Supreme Court has held that state law does not need to be applied. *Erie Railroad Co. v. Tompkins, supra* note 27; *Henkel v. Chicago, St. Paul, Minneapolis and Omaha Railway Co., supra,* at 446–47, 52 S.Ct. at 224–25. Therefore, the parties' position must be that I have discretion to tax expert witness fees under Rule 54(d), and that state law is one of the factors which I should consider. For the reasons stated above, I do not reach this question.